JEFFERSON COUNTY, ALABAMA *v.* ACKER, SENIOR
JUDGE, UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF
ALABAMA, ET AL.

No. 98–10.   Argued March 29, 1999—Decided June 21, 1999

426

GINSBURG, J., delivered the opinion of the Court, Parts I and III of which were unanimous, Part II of which was joined by STEVENS, O'CON- NOR, KENNEDY, and BREYER, JJ., and Part IV of which was joined by REHNQUIST, C. J., and STEVENS, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., and SOUTER and THOMAS, JJ., joined, *post*, p. 444. BREYER, J., filed an opinion concurring in part and dissent- ing in part, in which O'CONNOR, J., joined, *post*, p. 448.

*Jeffrey M. Sewell* argued the cause for petitioner. With him on the briefs was *Edwin A. Strickland.*

*Kent L. Jones* argued the cause for the United States as *amicus curiae* in support of petitioner. With him on the

brief were *Solicitor General Waxman, Assistant Attorney General Argrett, Deputy Solicitor General Wallace,* and *David English Carmack.*

*Alan B. Morrison* argued the cause for respondents. With him on the brief were *Irwin W. Stolz, Jr., Seaton D. Purdom,* and *David C. Vladeck.**

JUSTICE GINSBURG delivered the opinion of the Court.†

Jefferson County, Alabama, imposes an occupational tax on persons working within the county who are not otherwise required to pay a license fee under state law. The controversy before us stems from proceedings the county commenced to collect the tax from two federal judges who hold court in the county. Preliminarily, the parties dispute whether, as the federal judges assert, the collection proceedings may be removed to, and adjudicated in, federal court. On the merits, the judges maintain that they are shielded from payment of the tax by the intergovernmental tax immunity doctrine, while the county urges that the doctrine does not apply unless the tax discriminates against an officeholder because of the source of his pay or compensation.

We hold that the case was properly removed under the federal officer removal statute, 28 U. S. C. § 1442(a)(3), and that the Tax Injunction Act, § 1341, does not bar federal-court adjudication. We further conclude that Jefferson County's tax operates as a nondiscriminatory tax on the judges' compensation, to which the Public Salary Tax Act of 1939, 4 U. S. C. § 111, consents.

---

*\*Charles DuBose Cole* filed a brief for Seven United States District Judges of the Northern District of Alabama as *amici curiae* urging affirmance.

†For the reasons stated in the opinion of JUSTICE SCALIA, THE CHIEF JUSTICE, JUSTICE SCALIA, JUSTICE SOUTER, and JUSTICE THOMAS do not believe this case was properly removed from state court. The Court having concluded otherwise, they join Parts I, III, and IV of this opinion.

## I

### A

Alabama counties, as entities created by the State, can impose no tax absent state authorization. See *Estes* v. *Gadsden,* 266 Ala. 166, 170, 94 So. 2d 744, 747 (1957). Alabama, the parties to this litigation agree, has not authorized its counties to levy an income tax. See *Jefferson County* v. *Acker,* 850 F. Supp. 1536, 1537–1538, n. 2 (ND Ala. 1994); *McPheeter* v. *Auburn,* 288 Ala. 286, 292, 259 So. 2d 833, 837 (1972); *Estes,* 266 Ala., at 171–172, 94 So. 2d, at 748–750.[1] In 1967, Alabama authorized its counties to levy a "license or privilege tax" upon persons who do not pay any other license tax to either the State or county. 1967 Ala. Acts 406, § 3. As stated in the authorization, a county may impose the tax "upon any person for engaging in any business" for which a license or privilege tax is not required by either the State of Alabama or the county under the laws of the State of Alabama. § 4.

Pursuant to Alabama's authorization, Jefferson County, in 1987, enacted Ordinance Number 1120, "establish[ing] a license or privilege tax on persons engaged in any vocation, occupation, calling or profession in [the] County who is not required by law to pay any license or privilege tax to either the State of Alabama or the County." Ordinance No. 1120, preamble (1987) (Ordinance or Ordinance No. 1120). The Ordinance declares it "unlawful . . . to engage in" a covered occupation without paying the tax. § 2. Included among those subject to the tax are "hold[ers] of any kind of office or position either by election or appointment, by any federal, state, county or city officer or employee where the services

---

[1] Most States, it appears, like Alabama, have not authorized local imposition of an "income tax." See J. Aronson & J. Hilley, Financing State and Local Governments 149 (4th ed. 1986) ("Eleven states have authorized their local governments to levy wage or income taxes."); cf. 1 CCH State Tax Guide ¶ 15–100, p. 3512 (1998) (listing cities in 11 States that impose personal income taxes).

of such official or employee are rendered within Jefferson County." § 1(C). The fee is measured by one-half percent of the "gross receipts" of the person subject to the tax. § 2. "[G]ross receipts" is defined as having "the same meaning" as "compensation," and includes "all salaries, wages, commissions, [and] bonuses." § 1(F). Ordinance No. 1120 thus implements the taxing authority accorded counties by the Alabama Legislature. The State's permission left no room for a local tax on compensation of a different name or order.

## B

Respondents William M. Acker, Jr., and U. W. Clemon are United States District Judges for the Northern District of Alabama. Both maintain their principal office in Jefferson County, and both resist payment of the county's "license or privilege tax" on the ground that it violates the intergovernmental tax immunity doctrine. The county instituted a collection suit in Alabama small claims court against each of the judges, which each removed to the Federal District Court under the federal officer removal statute, 28 U. S. C. § 1442 (1994 ed. and Supp. III). After denying the county's motions to remand, the federal court consolidated the cases, and eventually granted summary judgment for respondents; the court held Jefferson County's tax unconstitutional under the intergovernmental tax immunity doctrine to the extent that the tax reached the compensation of federal judges. See *Jefferson County*, 850 F. Supp., at 1537, 1545–1546.[2]

---

[2] The District Court also held that applying the tax to the judges diminished their pay and therefore violated the Compensation Clause of Article III of the Constitution. See *Jefferson County* v. *Acker*, 850 F. Supp., at 1548; U. S. Const., Art. III, § 1 (federal judges "shall ... receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office"). The Court of Appeals declined to address that question, and it is not before this Court. See *Jefferson County* v. *Acker*, 92 F. 3d 1561, 1566 (CA11 1996) (en banc).

430

A panel of the United States Court of Appeals for the Eleventh Circuit initially reversed the District Court's judgment, *Jefferson County* v. *Acker,* 61 F. 3d 848 (1995), but the Circuit, sitting en banc, affirmed the District Court's disposition, *Jefferson County* v. *Acker,* 92 F. 3d 1561, 1576 (1996). We granted Jefferson County's initial petition for certiorari and remanded the case for further consideration of the question whether the Tax Injunction Act, 28 U. S. C. § 1341, deprived the District Court of jurisdiction to adjudicate the matter. *Jefferson County* v. *Acker,* 520 U. S. 1261 (1997). On remand, the Eleventh Circuit adhered to its prior en banc decision. See 137 F. 3d 1314, 1324 (1998) (en banc). We again granted certiorari to consider both the threshold Tax Injunction Act issue and the merits of the case. 525 U. S. 1039–1040 (1998). We take up as well an anterior question raised by the Solicitor General: Was removal from state court to federal court unauthorized by the federal officer removal statute?

## II

The federal officer removal provision at issue states:

"(a) A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

. . . . .

"(3) Any officer of the courts of the United States, for any act under color of office or in the performance of his duties." 28 U. S. C. § 1442 (1994 ed. and Supp. III).[3]

It is the general rule that an action may be removed from state court to federal court only if a federal district court would have original jurisdiction over the claim in suit. See 28 U. S. C. § 1441(a). To remove a case as one falling within

---

[3] Other subsections of § 1442 establish similar removal rights for other federal officers. See 28 U. S. C. §§ 1442(a), (b) (1994 ed. and Supp. III).

federal-question jurisdiction, the federal question ordinarily must appear on the face of a properly pleaded complaint; an anticipated or actual federal defense generally does not qualify a case for removal. See *Louisville & Nashville R. Co.* v. *Mottley,* 211 U. S. 149, 152 (1908). Suits against federal officers are exceptional in this regard. Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law.

To qualify for removal, an officer of the federal courts must both raise a colorable federal defense, see *Mesa* v. *California,* 489 U. S. 121, 139 (1989), and establish that the suit is *"for* a[n] act under color of office," 28 U. S. C. § 1442(a)(3) (emphasis added). To satisfy the latter requirement, the officer must show a nexus, a " 'causal connection' between the charged conduct and asserted official authority." *Willingham* v. *Morgan,* 395 U. S. 402, 409 (1969) (quoting *Maryland* v. *Soper (No. 1),* 270 U. S. 9, 33 (1926)).

In construing the colorable federal defense requirement, we have rejected a "narrow, grudging interpretation" of the statute, recognizing that "one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." 395 U. S., at 407. We therefore do not require the officer virtually to "win his case before he can have it removed." *Ibid.* Here, the judges argued, and the Eleventh Circuit held, that Jefferson County's tax falls on "the performance of federal judicial duties in Jefferson County" and "risk[s] interfering with the operation of the federal judiciary" in violation of the intergovernmental tax immunity doctrine; that argument, although we ultimately reject it, see *infra,* at 435–443, presents a colorable federal defense. *Jefferson County,* 92 F. 3d, at 1572. There is no dispute on this point. See *post,* at 448 (SCALIA, J., concurring in part and dissenting in part).

We next consider whether the judges have shown that the county's tax collection suits are *"for* a[n] act under color of office." 28 U. S. C. § 1442(a)(3) (emphasis added). The essence of the judges' colorable defense is that Jefferson County's Ordinance expressly declares it "unlawful" for them to "engage in [their] occupation" without paying the tax, Ordinance No. 1120, § 2, and thus subjects them to an impermissible licensing scheme. The judges accordingly see Jefferson County's enforcement actions as suits "for" their having "engage[d] in [their] occupation." The Solicitor General, in contrast, argues that there is no causal connection between the suits and the judges' official acts because "[t]he tax . . . was imposed only upon [the judges] personally and not upon the United States or upon any instrumentality of the United States." Brief for United States as *Amicus Curiae* 20. To choose between those readings of the Ordinance is to decide the merits of this case. Just as requiring a "clearly sustainable defense" rather than a colorable defense would defeat the purpose of the removal statute, *Willingham,* 395 U. S., at 407, so would demanding an airtight case on the merits in order to show the required causal connection. Accordingly, we credit the judges' theory of the case for purposes of both elements of our jurisdictional inquiry and conclude that the judges have made an adequate threshold showing that the suit is "for a[n] act under color of office." 28 U. S. C. § 1442(a)(3).

JUSTICE SCALIA maintains that the county's lawsuit was not grandly "for" the judges' performance of their official duties, but narrowly "for" their having refused to pay the tax. The judges' resistance to payment of the tax, he states, was neither required by the responsibilities of their offices nor undertaken in the course of job performance. See *post,* at 447. The county's lawsuit, however, was not simply "for" a refusal; it was "for" payment of a tax. The county asserted that the judges had failed to comply with the Ordinance; read literally, as the judges urge and as we accept

solely for purposes of this jurisdictional inquiry, that measure required the judges to pay a license fee before "engag[ing] in [their] occupation." Ordinance No. 1120, § 2. The circumstances that gave rise to the tax liability, not just the taxpayers' refusal to pay, "constitute the basis" for the tax collection lawsuits at issue. See *Willingham*, 395 U. S., at 409 (" It is enough that [petitioners'] acts or [their] presence at the place in performance of [their] official duty constitute the basis . . . of the state prosecution." (internal quotation marks omitted)). Here, those circumstances encompass holding court in the county and receiving income for that activity. In this light, we are satisfied that the judges have shown the essential nexus between their activity "under color of office" and the county's demand, in the collection suits, for payment of the local tax.

## III

The Tax Injunction Act provides:

> "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U. S. C. § 1341.

This statutory text "is to be enforced according to its terms" and should be interpreted to advance "its purpose" of "confin[ing] federal-court intervention in state government." *Arkansas* v. *Farm Credit Servs. of Central Ark.*, 520 U. S. 821, 826–827 (1997). By its terms, the Act bars anticipatory relief, suits to stop ("enjoin, suspend or restrain") the collection of taxes. Recognizing that there is "little practical difference" between an injunction and anticipatory relief in the form of a declaratory judgment, the Court has held that declaratory relief falls within the Act's compass. *California* v. *Grace Brethren Church*, 457 U. S. 393, 408 (1982). But a suit to collect a tax is surely not brought to restrain state

action, and therefore does not fit the Act's description of suits barred from federal district court adjudication. See *Louisiana Land & Exploration Co.* v. *Pilot Petroleum Corp.*, 900 F. 2d 816, 818 (CA5 1990) ("The Tax Injunction Act does not bar federal court jurisdiction [of a] suit . . . to collect a state tax.").

Nevertheless, in *Keleher* v. *New England Telephone & Telegraph Co.*, 947 F. 2d 547 (CA2 1991), the Court of Appeals concluded:

> "[I]n removing the federal courts' power to 'enjoin, suspend or restrain' state and local taxes, [Congress] necessarily intended for federal courts to abstain from hearing tax enforcement actions in which the validity of a state or local tax might reasonably be raised as a defense." *Id.*, at 551.[4]

We do not agree that the Act's purpose requires us to disregard the text formulation Congress adopted.

Congress modeled the Tax Injunction Act, which passed in 1937, upon previously enacted federal "statutes of similar import," measures that parallel state laws barring "actions in State courts to enjoin the collection of State and county taxes." S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937). The federal statute Congress had in plain view was an 1867 measure depriving courts of jurisdiction over suits brought "for the purpose of restraining the assessment or collection" of any federal tax. Act of Mar. 2, 1867, ch. 169, § 10, 14 Stat. 475, now codified at 26 U. S. C. § 7421(a) (1994 ed., Supp. III). The 1867 provision, of course, does not bar federal-court ad-

---

[4] The Second Circuit further stated that "[e]ven if Congress did not intend the Act's jurisdictional bar to reach so far, . . . we believe that general principles of federal court abstention would nonetheless require us to stay our hand here." 947 F. 2d, at 551. *Keleher* was a diversity action raising "'difficult questions of state law bearing on policy problems of substantial public import.'" *Ibid.* (quoting *Colorado River Water Conservation Dist.* v. *United States*, 424 U. S. 800, 814 (1976)). See *infra*, at 435, n. 5.

judication of suits initiated by the United States to collect federal taxes; it precludes only suits brought by taxpayers to restrain the United States from assessing or collecting such taxes. Similarly, the state laws to which Congress referred surely do not preclude the States from enforcing their taxes in court.

The Tax Injunction Act was thus shaped by state and federal provisions barring anticipatory actions by taxpayers to stop the tax collector from initiating collection proceedings. It was not the design of these provisions to prohibit taxpayers from defending suits brought by a government to obtain collection of a tax. Congress, it appears, sought particularly to stop out-of-state corporations from using diversity jurisdiction to gain injunctive relief against a state tax in federal court, an advantage unavailable to in-state taxpayers denied anticipatory relief under state law. See S. Rep. No. 1035, *supra*, at 2. In sum, we hold that the Tax Injunction Act, as indicated by its terms and purpose, does not bar collection suits, nor does it prevent taxpayers from urging defenses in such suits that the tax for which collection is sought is invalid.[5]

## IV

The Eleventh Circuit held that Jefferson County's license tax, as applied to federal judges, amounts to "a direct tax on the federal government or its instrumentalities" in violation of the intergovernmental tax immunity doctrine. *Jefferson*

---

[5] As noted in *Keleher* v. *New England Telephone & Telegraph Co.*, 947 F. 2d 547, 551 (CA2 1991), see *supra*, at 434, n. 4, abstention and stay doctrines may counsel federal courts to withhold adjudication, according priority to state courts on questions concerning the meaning and proper application of a state tax law. Cf. *Burford* v. *Sun Oil Co.*, 319 U. S. 315, 332–334 (1943); *Quackenbush* v. *Allstate Ins. Co.*, 517 U. S. 706, 719–721 (1996) (in a case seeking damages, rather than equitable relief, a federal court may not abstain, but can stay the action pending resolution of the state-law issue). No one has argued for the application of such doctrines here.

*County*, 92 F. 3d, at 1576. That ruling extends the doctrine beyond the tight limits this Court has set and is inconsistent with the controlling federal statute. The county's Ordinance lays no "demands directly on the Federal Government," *United States* v. *New Mexico*, 455 U. S. 720, 735 (1982); it is, and operates as, a tax on employees' compensation. The Public Salary Tax Act allows a State and its taxing authorities to tax the pay federal employees receive "if the taxation does not discriminate against the [federal] employee because of the source of the pay or compensation." 4 U. S. C. § 111. We hold that Jefferson County's tax falls within that allowance.

A

Until 1938, the intergovernmental tax immunity doctrine was expansively applied to prohibit Federal and State Governments from taxing the salaries of another sovereign's employees. See, *e. g., Dobbins* v. *Commissioners of Erie Cty.*, 16 Pet. 435, 450 (1842); *Collector* v. *Day*, 11 Wall. 113, 124 (1871). In *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 486–487 (1939), the Court expressly overruled prior decisions and held that a State's imposition of a tax on federal employees' salaries "lays [no] unconstitutional burden upon [the Federal Government]."[6] Although taxes "upon the incomes of employees of a government, state or national, . . . may be passed on economically to that government," the Court reasoned, the federal design tolerates such "indirect [and] incidental" burdens. *Id.*, at 487. Since *Graves*, we

---

[6] *Graves* carried out the doctrinal contraction presaged in *Helvering* v. *Gerhardt*, 304 U. S. 405, 424 (1938), which held that the Federal Government could tax the salaries of employees of the Port of New York Authority. See also *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 138, 149, 159–161 (1937) (in determining that a state "privilege ta[x]" on federal contractors did not violate the intergovernmental tax immunity doctrine, the Court rejected the theory that a tax on income is a tax on its source (internal quotation marks omitted)).

have reaffirmed "a narrow approach to governmental tax immunity," *New Mexico*, 455 U. S., at 735;[7] we have closely confined the doctrine to "ba[r] only those taxes that [are] imposed directly on one sovereign by the other or that discriminat[e] against a sovereign or those with whom it deal[s]," *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 811 (1989). In contracting the once expansive intergovernmental tax immunity doctrine, we have recognized that the area is one over which Congress is the principal superintendent. See *New Mexico*, 455 U. S., at 737–738.

Indeed, congressional action coincided with the *Graves* turnaround. In the Public Salary Tax Act, under consideration before *Graves* was announced and enacted shortly thereafter, see *Davis*, 489 U. S., at 811–812, Congress consented to nondiscriminatory state and local taxation of federal employees' "pay or compensation for personal service," 4 U. S. C. § 111.[8] Section 111 effectively "codified the result in *Graves*," and thereby "foreclosed the possibility that subsequent judicial reconsideration . . . might reestablish the broader interpretation of the immunity doctrine." *Davis*, 489 U. S., at 812; see also *id.*, at 813 (the immunity for which § 111 provides is "coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity").

---

[7] *New Mexico* held that New Mexico transgressed no constitutional limit when it required federal contractors to pay the State's gross receipts tax for the "privilege" of doing business with the Federal Government in the State. 455 U. S., at 727, 744 (internal quotation marks omitted).

[8] Section 111 provides:

"The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation."

In *Howard* v. *Commissioners of Sinking Fund of Louisville*, 344 U. S. 624 (1953), the Court held that a "license fee" similar in relevant respects to Jefferson County's was an "income tax" for purposes of a federal statute that defines "income tax" as "any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts," 4 U. S. C. § 110(c). See 344 U. S., at 625, n. 2, 629.[9] The Court so concluded even though the local tax was styled as "a tax upon the privilege of working within [the municipality]," was not an "income tax" under state law, and deviated from textbook income tax characteristics. *Id.*, at 628–629; see also *id.*, at 629 (Douglas, J., dissenting) ("Many kinds of income are excluded, *e. g.*, dividends, interest, capital gains. The exclusions emphasize that the tax is on the *privilege* of working or doing business in [the municipality].").[10]

---

[9] *Howard* construed the Buck Act, which authorizes state and local governments to collect "income tax[es]" from individuals who work in a "Federal area" "to the same extent . . . as though such area was not a Federal area." 4 U. S. C. § 106(a). The Buck Act defines "Federal area" to mean "any lands or premises held or acquired by or for the use of the United States." § 110(e). The United States submits that "[t]his definition appears, by its terms, to encompass premises used by the United States for the purposes of operating a federal courthouse," but further notes that the "origin and purpose of the Buck Act . . . were . . . limited . . . to ensur[ing] that federal officers and employees who reside or work within exclusive federal enclaves would be treated equally with those who reside and work outside such areas." Brief for United States as *Amicus Curiae* 28, n. 8 (citing S. Rep. No. 1625, 76th Cong., 3d Sess., 3 (1940)). As we conclude that the Public Salary Tax Act consents to Jefferson County's tax, we need not decide whether the Buck Act applies to this case.

[10] JUSTICE BREYER both recapitulates the reasoning of Justice Douglas' dissenting opinion in *Howard* and endeavors to distinguish the Court's decision in that case as involving "only [a] jurisdictional issue." *Post*, at 457 (opinion concurring in part and dissenting in part). One of the two questions on which the Court granted certiorari in *Howard*, however, explicitly asked the Court to determine "[t]he validity of the Louisville occupational tax or license fee ordinance as applied to employees of the [Naval] Ordnance Plant." 344 U. S., at 625. The Court squarely held: "[T]he tax is valid." *Id.*, at 629.

As *Howard* indicates, whether Jefferson County's license tax fits within the Public Salary Tax Act's allowance is a question of federal law. The practical impact, not the State's name tag, determines the answer to that question. See also *Detroit* v. *Murray Corp. of America*, 355 U. S. 489, 492 (1958) ("[I]n determining whether th[e] ta[x] violate[s] the Government's constitutional immunity we must look through form and behind labels to substance."); cf. *Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 159 (1930) (compatibly with the Fourteenth Amendment, a State "may impose different specific taxes upon different trades and professions"; "[i]n levying such taxes, the State is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value"). This much is beyond genuine debate.

B

The judges acknowledge that Jefferson County's Ordinance is valid if it "impose[s] a true tax on . . . income," but argue that the Ordinance ranks instead as an impermissible licensing scheme. Brief for Respondents 13–14, 27–33. Two aspects of the Ordinance, they say, remove the tax from the Public Salary Tax Act shelter for "taxation of pay or compensation for personal service," 4 U. S. C. § 111, and render the tax unconstitutional. First, the judges urge, the very words of the Ordinance make it unlawful for them and others to engage in their occupations without paying the license fee. Second, they maintain, the complete exclusion of persons who hold other Alabama licenses, however low the fee in comparison to Jefferson County's tax, is inconsistent with a true tax on income, but entirely consistent with a regulatory scheme requiring persons to have one and only one occupational license in a State. We are not persuaded.

Jefferson County's Ordinance declares it "unlawful . . . to engage in" a covered occupation (as pertinent here, to carry out the duties of a federal judge) without paying the license fee. Ordinance No. 1120, § 2. Based on the quoted words,

the respondent judges urge, as the Eleventh Circuit ruled, that the Ordinance is invalid under *Johnson* v. *Maryland,* 254 U. S. 51, 57 (1920), which held that a State could not require a federal postal employee to obtain a state driver's license before performing his federal duties. See *Jefferson County,* 92 F. 3d, at 1572–1573. In reading the Ordinance to impose a license requirement resembling the driver's license at issue in *Johnson,* the judges stress the Ordinance's incautious "unlawful . . . to engage in" language. Those words, however, likely were written with nonfederal employees, the vast majority of the occupational taxpayers, in front view. As earlier observed, see *supra,* at 439, the actual operation of the Ordinance, *i. e.,* its practical impact, is critical. See *Murray Corp.,* 355 U. S., at 492.

In practice, Jefferson County's license tax serves a revenue-raising, not a regulatory, purpose. Jefferson County neither issues licenses to taxpayers, nor in any way regulates them in the performance of their duties based on their status as licensed taxpayers. Cf. *Johnson,* 254 U. S., at 57 ("[The state license requirement] lays hold of [Federal Government employees] in their specific attempt to obey [federal] orders and requires qualifications in addition to those that the [Federal] Government has pronounced sufficient."); *Leslie Miller, Inc.* v. *Arkansas,* 352 U. S. 187, 189, 190 (1956) *(per curiam)* (holding that private contractors, seeking to bid on federal contracts, cannot be required first to submit to state licensing procedures that "determin[e]" a contractor's "qualifications"; such state regulation is inconsistent with the governing federal procurement statute and regulations, which provide standards for judging the "responsibility" of competitive bidders (internal quotation marks omitted)). In response to the judges' refusal to pay the tax, Jefferson County has done no more than institute a collection suit. See *Jefferson County,* 92 F. 3d, at 1565. Alabama, of course, cannot make it unlawful to carry out the

duties of a federal office without local permission, and in fact does not endeavor to do so.[11]

We consider next the judges' argument that the wholesale exemption for those who hold another state or county license reveals the Ordinance's true character as a licensing scheme, not an income tax. If the tax were genuinely an income tax, they urge, those license holders would not be excluded, although they might be allowed to claim their other license fees as credits or deductions against the county tax. Alabama's enabling Act does not allow its counties to so provide; those otherwise subject to license or privilege taxes under

---

[11] The shortcomings JUSTICE BREYER identifies in his first three objections, *post*, at 449–452, are of a sort this Court routinely rejects as cause for federal curtailment of the taxing power of state and local governments. See *Ohio Oil Co. v. Conway*, 281 U. S. 146, 159 (1930). His fourth objection, *post*, at 452–453, speaks of burdens Jefferson County imposes directly on the Federal Government—obligations to withhold the tax, to make complicated calculations, to keep detailed records. JUSTICE BREYER overlooks that it is the actual operation of the Ordinance—what is and not what might be—that counts in determining the merits of this case. See *Detroit v. Murray Corp. of America*, 355 U. S. 489, 492 (1958).

As a matter of undisputed fact, the burdens JUSTICE BREYER posits are hypothetical, not real. As the parties stipulated, "[a]ll active judges of the Northern District of Alabama except [respondents] have paid the County Occupational Tax on differing percentages of their judicial salaries," but "neither the Administrative Office of the United States Courts nor any Article III judge in the Northern District of Alabama . . . has ever made an oath certifying the alleged amounts of a federal judge's salary earned within and without Jefferson County," and "[t]he Administrative Office . . . has never withheld County Occupational Tax from any federal judge or court employee." *Jefferson County*, 850 F. Supp., at 1549; see also 5 U. S. C. § 5520(a) (authorizing the Secretary of the Treasury to enter into tax withholding agreements with local taxing authorities). Should Jefferson County someday exceed constitutional limits in its enforcement endeavors, a federal court would no doubt conserve what is constitutional, in line with the severability clauses contained in the state law and county Ordinance. See 1967 Ala. Acts 406, § 8; Jefferson County Ordinance No. 1120, § 13 (1987).

Alabama's laws may not be reached by a county's occupational tax. See 1967 Ala. Acts 406, § 4.[12] The dispositive measure, however, is the Public Salary Tax Act, which does not require the local tax to be a typical "income tax." Just as the statute in *Howard* consented broadly to *"any tax measured by net income, gross income, or gross receipts,"* 344 U. S., at 629, the Public Salary Tax Act consents to any tax on "pay or compensation," which Jefferson County's surely is. The sole caveat is that the tax "not discriminate . . . because of the [federal] source of the pay or compensation," 4 U. S. C. § 111, and we next consider that matter.[13]

## C

In *Davis*, the Court held that a state tax exempting retirement benefits paid by the State but not those paid by the Federal Government violated the Public Salary Tax Act's nondiscrimination requirement. See 489 U. S., at 817–818. Jefferson County's tax, by contrast, does not discriminate

---

[12] JUSTICE BREYER observes that these exemptions are various, numerous, and large. See *post*, at 451–452, 458–464. In this regard, we note the representation of counsel for Jefferson County at oral argument that "92 percent of the people who earn wages in [the] county pay [the] tax." Tr. of Oral Arg. 14. Counsel further stated that federal employees are at least proportionately represented among the eight percent exempt from the county's tax because they pay license fees to the State of Alabama. These figures are not in the record, counsel explained, "because this issue was never raised until we got to this Court." *Ibid.*; see also *id.*, at 14–15 (counsel for Jefferson County represented that of 12,000 federal employees in the county, 1,209 pay state license taxes and do not pay the county's occupational tax).

[13] The District Court ruled that the judges had failed to establish that the county's tax discriminates against federal officers or employees because of the source of their pay or compensation. See *Jefferson County*, 850 F. Supp., at 1539–1540. On appeal there was no contention that this determination was erroneous. See *Jefferson County*, 92 F. 3d, at 1566, n. 9. The judges nevertheless press the argument that the tax is discriminatory as an alternative ground for affirmance. See Brief for Respondents 34–37.

against federal judges in particular, or federal officeholders in general, based on the federal *source* of their pay or compensation. The tax is paid by all State District and Circuit Court judges in Jefferson County and the three State Supreme Court justices who have satellite offices in the county. See *Jefferson County*, 850 F. Supp., at 1549.

The judges urge that, as federal judges can never fit within the county's exemption for those who hold licenses under other state or county laws, that exemption unlawfully disfavors them. See Brief for Respondents 14–15. The record shows no discrimination, however, between similarly situated federal and state employees. Cf. *Davis*, 489 U. S., at 814 ("It is undisputed that Michigan's tax system discriminates in favor of retired state employees and against retired federal employees."). Should Alabama or Jefferson County authorities take to exempting state officials while leaving federal officials (or a subcategory of them) subject to the tax, that would indeed present a starkly different case. Here, however, there is no sound reason to deny Alabama counties the right to tax with an even hand the compensation of federal, state, and local officeholders whose services are rendered within the county. See *United States* v. *County of Fresno*, 429 U. S. 452, 462 (1977) (upholding requirement that employees of U. S. Forest Service pay California property tax on homes located on federal land and provided to employees as part of their compensation; Court observed that state tax does not discriminate unconstitutionally against federal employees if the tax is "imposed equally on . . . similarly situated constituents of the State").

\* \* \*

For the reasons stated, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE SOUTER, and JUSTICE THOMAS join, concurring in part and dissenting in part.

An officer of the federal courts may remove an action commenced against him in state court *"for* any act under color of office or in the performance of his duties." 28 U. S. C. § 1442(a)(3) (emphasis added). In my view, respondents have failed to show a " 'causal connection' between the charged conduct and asserted official authority," *Willingham* v. *Morgan,* 395 U. S. 402, 409 (1969). I therefore dissent from Part II of the Court's opinion.

Respondents read Ordinance No. 1120 as creating more than tax liability; in their view, the ordinance makes it unlawful to work if the tax goes unpaid. Building upon this reading, they assert that the county has sued them for performing their duties without a license, a complaint that would clearly establish the causal connection required by 28 U. S. C. § 1442(a)(3). This theory, however, is simply inconsistent with the complaints the county filed. It may perhaps be possible under Alabama law for the county to bring a misdemeanor prosecution against one who engages in a business or profession without having paid the required license fee; and the county may perhaps have a right to enjoin the conduct of a business or the practice of a profession when the license fee has not been paid. But no such action is before us here. Instead, the county has sued each of these respondents for refusing to pay the fee, as evidenced by the fact that the only relief it sought was the money due. See Complaints in Nos. DV9209643 and DV9209695 (Jefferson County District Court). When identifying, for purposes of § 1442(a)(3), what a suit is "for," it is necessary to focus, not on grounds of liability that the plaintiff *could* assert, but on the ground *actually* asserted. Regardless of whether Ordinance No. 1120 also purports to proscribe working without a license, *these* suits were only about respondents' refusal to pay the tax. That refusal is thus the act to which

we should look in determining whether these suits were brought "for any act under color of office or in the performance of [official] duties."

Refusing to pay a tax, even an unconstitutional one, is not an action required by respondents' official duties, nor an action taken in the *course* of performing their official duties (as was, for example, the alleged physical abuse of an inmate by prison officials in *Willingham, supra*). Judges Acker and Clemon may well have been motivated by a desire to vindicate the interests of the Federal Judiciary. But their refusal to turn over money from their personal funds was not related to the responsibilities of their judicial office.

The opinion for the Court does not dispute this. Instead, it claims that holding the causation requirement unsatisfied would merge the merits issue with the removal issue. *Ante*, at 432. Since, the Court appears to reason, this fee might be unconstitutional if it is imposed upon the function of being a federal judge (the merits question), holding that these suits were not brought "for" their being federal judges would in effect decide the merits. That is illogical. What the *fee* is imposed *upon*, and what the *suits* are *for* are two different questions.[1] If the cases were remanded to state court, respondents would remain free to argue that the burden of this exaction is upon the function of being a federal judge, rather than upon income. To be sure, the facts would be more favorable for that argument if the ordinance had been enforced by a different sort of suit, which *would* have qualified for removal—for example, suits seeking to en-

---

[1] Some confusion may have resulted from the fact that the Government argued this issue in a way that did conflate the merits with removal. See *ante*, at 432. It said that there was no causal connection because "[t]he tax . . . was imposed only upon [the judges] personally and not upon the United States or upon any instrumentality of the United States." Brief for United States as *Amicus Curiae* 20. As I explain above, however, proving who the fee was imposed *upon* does not answer the question of what the suit is *for*.

join respondents from performing their duties rather than suits to collect the unpaid "license fee." But even in the present suits, which do not qualify for removal, respondents could argue that this is a charge prohibited by the intergovernmental tax immunity doctrine. Deciding that the cases were improperly removed would simply mean that that defense would have to be made in state court. For although the removal statute creates an exception to the well-pleaded-complaint doctrine, the exception is not for all federal-question defenses asserted by federal officials, but rather for all suits *"for* any act under color of office or in the performance of [official] duties."

It is enough for the Court that respondents have identified some connection, albeit remote, with their federal offices. See *ibid.* The majority says that all the circumstances giving rise to these suits must be considered, and "those circumstances encompass holding court in the county and receiving income for that activity." *Ante,* at 433. In other words, *but for* the judges' working—an act unquestionably within the scope of their official duties—they would not have owed taxes under Ordinance No. 1120 and thus would not have been sued. "But for" causation, however, is not enough.

In *Maryland* v. *Soper (No. 2),* 270 U. S. 36 (1926), four prohibition agents and their chauffeur were prosecuted in state court for lying under oath to the state coroner, and they sought to remove the case under a predecessor of the current federal-officer removal statute.[2] According to the

---

[2] Section 33 of the Judicial Code provided:
"That when any civil suit or criminal prosecution is commenced in any court of a State against any officer appointed under or acting by authority of any revenue law of the United States . . . or against any person acting under or by authority of any such officer, on account of any act done under color of his office . . . the said suit or prosecution may at any time before the trial or final hearing thereof be removed for trial into the district court next to be holden in the district where the same is pending . . . ." 39 Stat. 532, ch. 399.

agents, they were on their way to report to their superior about a freshly discovered illegal still when they came upon a mortally wounded man in the road. Had they not been *en route* to their superior, the agents argued, they would never have made the discovery that required them to testify before the coroner. We rejected the argument that this established a sufficient connection between their official duty and the obstruction-of-justice prosecution. Although reporting to their superior was certainly among their official duties, the act of testifying before the coroner was not, and it was *the latter* act "on account of" which (or in the terms of the current removal statute, "for" which) they were prosecuted. *Id.*, at 42. So also here, it is not enough that respondents' performance of their judicial duties was a link in the chain of events that brought about these suits—that had they not performed their official duties, the fee would not have been assessed, and had the fee not been assessed they would not have been sued for failure to pay it. Acker and Clemon were sued *for* their refusal to pay the tax—and that, as I have said, is not an act required by, or even performed in connection with, cf. *Willingham* v. *Morgan*, 395 U. S. 402 (1969), the duties of their judicial office.

None of this is to suggest, of course, that removal is justified only when the federal officer can prove that the act prompting suit is, beyond doubt, an official one. If that were the case, the merits truly would be subsumed within the jurisdictional question of removal; the defense of qualified immunity, for example, would always be resolved as a threshold jurisdictional question—an odd result when the main point of 28 U. S. C. § 1443 is to give officers a federal forum in which to litigate the merits of immunity defenses. See *Willingham* v. *Morgan, supra,* at 407. The point is only that the officer should have to identify as the gravamen of the suit an act that was, if not required by, at least closely connected with, the performance of his official functions. 28

U. S. C. § 1443; *Maryland* v. *Soper (No. 1)*, 270 U. S. 9, 33 (1926); *Willingham* v. *Morgan, supra,* at 407–409. What should defeat respondents here is that even though their federal defense is colorable, their claim to have acted in official capacity in not paying the fee is not.

\* \* \*

For the foregoing reasons, I would hold that this case was improperly removed. In view, however, of the decision of a majority of the Court to reach the merits, I join Parts I, III, and IV of the Court's opinion. Cf. *Edgar* v. *MITE Corp.*, 457 U. S. 624, 646 (1982) (Powell, J., concurring in part); *United States* v. *Jorn*, 400 U. S. 470, 488 (1971) (Black, J., concurring in judgment).

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I agree that we have jurisdiction to hear the merits of this case, and I join Parts I, II, and III of the Court's opinion. I do not agree with the majority, however, about the constitutionality of the tax.

If Jefferson County's license fee amounts to a tax imposed directly upon a federal official's performance of his official duties, it runs afoul of the intergovernmental tax immunity doctrine. See *United States* v. *New Mexico*, 455 U. S. 720, 733 (1982) ("[A] State may not, consistent with the Supremacy Clause, U. S. Const., Art. VI, cl. 2, lay a tax 'directly upon the United States'" (citation omitted)); *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 157 (1937); *e. g., Leslie Miller, Inc.* v. *Arkansas*, 352 U. S. 187, 190 (1956) *(per curiam)* ("'[I]mmunity'" of federal "'instruments'" from state control in performance of duties extends to state requirement that "'they desist from performance'" until they take an examination to satisfy the State "'that they are competent'" *and* "'pay a fee for permission to go on'") (quoting *Johnson* v. *Maryland*, 254 U. S. 51, 57 (1920)). On the other

hand, if Jefferson County's license fee amounts to an income tax, there is no constitutional problem. See *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 486 (1939); Public Salary Tax Act of 1939, 4 U. S. C. § 111. The question here is whether Jefferson County's license fee is a fee for the performance of official federal duties or, rather, whether it is an income tax on federal employees. In my view, it is the former.

I

I concede that Jefferson County measures the amount of its tax by taking a small percentage of the "gross receipts" or income derived from the licensed activity. Jefferson County Ordinance No. 1120, § 1(F) (1987). The way in which a State measures a tax, however, is only one relevant feature. A state law, for example, that imposed fines upon all appellate judges who took too long in issuing decisions, cf. Cal. Govt. Code Ann. § 68210 (West 1997) (salary withheld from tardy judges), would not suddenly become an "income tax" if the State began to measure the tax or fine, say, in terms of a small percentage of the judge's federal income tax liability. Nor would a similar tax imposed upon a judge each time he administers an official oath automatically become an "income tax." Neither would a driver's license fee or a motor vehicle license fee become an "income tax" should imaginative state legislators make the fees "progressive" by devising some similar system of measurement. Consequently, one must look beyond that single feature of measurement in order to determine the nature of the tax as it operates in practice. Cf. *Lawrence* v. *State Tax Comm'n of Miss.*, 286 U. S. 276, 280 (1932). And four specific features of this rather unusual tax, taken together, convince me that it is not an "income tax."

First, the language, structure, and purpose of the ordinance indicate that it imposes a fee upon the performance of work, not a tax upon income. The ordinance is entitled "Occupational Tax." It describes its purpose as establishing

a "license . . . tax" or a "tax" on the "privilege" of engaging in a "vocation, occupation, calling or profession." Ordinance No. 1120, preamble. And its operative language speaks in terms of a condition imposed upon work, not of a tax upon income. It says that it

> "*shall be unlawful* for any person *to engage in* or follow [with certain exceptions] any vocation, occupation, calling or profession . . . without paying license fees to the County for the privilege of engaging in or following such vocation, occupation, calling or profession . . . ." § 2 (emphasis added).

The state law that authorizes the county's tax describes its own purpose as one of "equaliz[ing] the burden of taxation," and it authorizes the county "to levy a license or privilege tax upon any person for engaging in any business" *other* than a business already subject to other state or county licensing fees, liability for which is triggered, not by income, but by engaging in the work. See 1967 Ala. Acts 406, §§ 3, 4; see generally Appendix, *infra*, at 458–464. Indeed, the Alabama Supreme Court has found as a matter of state law that a municipal tax very similar in substance to Jefferson County's tax was an occupational license tax, rather than an income tax. See *McPheeter* v. *Auburn*, 288 Ala. 286, 292, 259 So. 2d 833, 837 (1972).

Second, the tax, as measured, works more like a licensing fee than an income tax. On the one hand, the tax calculation *does not include* many kinds of *income*, such as retirement income, dividends, interest, or other unearned income, or earned income if that income is earned outside the county—irrespective of how much income is involved. See Ordinance No. 1120, § 1(F). On the other hand, by the terms of the ordinance, not only a county resident but also a non-resident who works some of the time in Jefferson County, §§ 1(B), 3, must pay the tax as long as he becomes "entitled to receive" pay for his work, even if he receives that pay

only in a later year or *never receives any income* at all, see § 1(F). And, of course, as I mentioned earlier, the event that triggers liability is not the receipt of income but the person's "engag[ing]" in certain work. § 2.

Third, Jefferson County's tax is riddled with exceptions, which make sense only if one sees the tax as part of a state-wide occupational *licensing* scheme, not as an income tax. See 1967 Ala. Acts 406, § 4 (authorizing counties to impose a license tax only in respect to occupations not subject to state, or other county, licensing taxes). The ordinance excludes from its definition of "vocation, occupation, calling and profession" domestic servants, those engaged in occupations licensed elsewhere by the county, and those engaged in the more than 150 occupations licensed by the State. Ordinance No. 1120, § 1(B). This last-mentioned category is large. Its members range from architects to amusement park operators, from detectives to dentists, from laundry owners to lawyers, from sewing machine operators to scientists. See generally Ala. Code § 40–12–41 *et seq.* (1993); Appendix, *infra*, at 458–464. And the licensing fees that the State exacts from this range of individuals are, with only a few exceptions, all unrelated to income. Each attorney, for example, pays "an annual license tax to the state" in the amount of $250, § 40–12–49; each civil, electrical, or mechanical engineer pays $20, § 40–12–99; and each ticket scalper pays $100, § 40–12–167. Some fees vary depending upon special industry-related features, such as population (*e. g.,* advertising, § 40–12–45; amusement park operators, § 40–12–47), number of employees (*e. g.,* automobile garages or shops, § 40–12–54), or business size (*e. g.,* soft-drink bottlers, number of bottles per minute, § 40–12–65; construction companies, value of orders accepted, § 40–12–84; vending machine operators, total sales, § 40–12–176). License fees for a handful of businesses are measured by the income or gross receipts of the company (not of a private person). See § 40–16–4 (certain financial institutions); §§ 40–21–50, 40–21–53

(public utilities); § 40–21–57 (railroad operators); § 40–21–60 ("express" shipping companies).

These many exceptions to the ordinance mean that individuals with identical pay earned from work performed within Jefferson County will pay very different amounts in license fees. Such differences are not surprising where occupational licensing fees are at issue, as different license charges with different legislative pedigrees and applied to different industries often vary dramatically one to the next. Cf. *Ohio Oil Co.* v. *Conway*, 281 U. S. 146, 159 (1930) (State "may impose different specific taxes upon different trades and professions and may vary the rates of excise upon various products" without violating the Fourteenth Amendment's Equal Protection and Due Process Clauses). But I am not aware of any *income tax* that would produce such widespread differences in the tax owed by persons with identical incomes. Nor can Jefferson County separate its own tax from the rest of the State's licensing system by claiming that its own tax is different in kind. It would not make sense for a county income tax to exempt an engineer entirely, simply because he had paid the State $20 for a license; at most a county income tax might provide a $20 deduction from, or credit against, the amount of income tax due to the county. But, of course, if the county's tax is simply another *licensing* fee, then this structure makes sense. The engineer does not pay the county anything at all, because he has already paid a licensing fee to the State; the county charge would be redundant. The empirical significance of these factors depends upon the makeup of the work force in Jefferson County (*e. g.*, to what extent is Jefferson County made up of bedroom communities whose residents work elsewhere), a matter about which the record tells us nothing.

Fourth, Jefferson County's ordinance directly imposes upon the Federal Government (the federal official's employer) burdens that to a limited extent exceed those imposed by an ordinary state or local income tax. The ordi-

nance requires the employer, obliged to withhold the tax, to determine where the employee has spent each working day and apportion related wages accordingly. Ordinance No. 1120, §§ 3, 4. The task of apportioning an employee's workday is more complicated and more closely connected to official duties than simply determining where an employee resides—the conventional "income tax" recordkeeping requirement. Similarly, a tax liability that arises from having worked on a particular day in a particular place, together with related and complex recordkeeping requirements, creates a risk that the tax will have a practical influence upon official decisions in a way that an ordinary income tax will not. (Consider, for example, a federal criminal case in which the defendant seeks a change of venue to Jefferson County. *E. g., United States* v. *Tokars*, 839 F. Supp. 1578 (ND Ga. 1993); see *Jefferson County* v. *Acker*, 92 F. 3d 1561, 1573, and n. 18 (CA11 1996).) Further, the ordinance's language says it is unlawful for a federal employee who has not paid the tax to perform his work—that is, it prohibits "engag[ing]" in that work. Ordinance No. 1120, § 2. This language, which I assume could not actually authorize an injunction against the performance of federal work, could nonetheless have an unwelcome impact on a conscientious but tax-delinquent judge who has sworn to uphold the law.

I recognize that one might find income taxes that embody one or two of the features that I have just discussed. Income taxes come in many shapes and sizes. But I do not claim that any one or two of the considerations I have mentioned is sufficient to prove my point. Rather, it is all these features taken together that tip the balance.

The majority either ignores or attempts to distinguish each of these features on its own, as by itself potentially unconsitutional or found in other income taxes. *Ante*, at 439–442. But it is a consideration of the whole, not of each separate part, that leads to my conclusion. To properly characterize a tax, all of its distinguishing features must be

properly taken into account. Each of the features discussed above seems an *odd* or *unusual* feature of an income tax but an *ordinary* feature of a licensing fee. *Taken together*, these features show that the tax before us is so different from an ordinary income tax, and so much like a licensing fee, that for federal constitutional purposes I must conclude that Jefferson County has imposed an occupational or license tax—that is, a fee for obtaining a license to engage in official work—just as the county in its ordinance purports to do.

## II

Jefferson County argues that, in any event, the United States has consented to the imposition of the tax. It points first to the Public Salary Tax Act of 1939, which grants federal consent "to the taxation of pay or compensation for personal service as an officer or employee of the United States . . . by a duly constituted taxing authority." 4 U. S. C. § 111.

This statute cannot help Jefferson County, however, because in *Graves*, this Court held only that the intergovernmental tax immunity doctrine does not prevent a State from imposing a nondiscriminatory tax upon "the salaries of officers or employees of the national . . . government." 306 U. S., at 486. And the Public Salary Tax Act

> "simply codified the result in *Graves* and foreclosed the possibility that subsequent judicial reconsideration of that case might reestablish the broader interpretation of the immunity doctrine." *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 812 (1989).

See also *id.*, at 811–812 ("[D]uring most of the legislative process leading to adoption of the Act it was unclear whether state taxation of federal employees was still barred by intergovernmental tax immunity"); H. R. Rep. No. 26, 76th Cong., 1st Sess., 2 (1939). If Jefferson County's tax is not an income tax and hence falls outside the scope of *Graves*, this statute cannot save it.

The second statute upon which the county relies, the Buck Act, presents a more difficult question. It says:

> "No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein . . . by reason of his residing within a federal area or receiving income from transactions occurring or services performed in such area; and such . . . taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area . . . to the same extent and with the same effect as though such area was not a Federal area." 4 U. S. C. § 106(a).

A special definitional provision, which applies through cross-reference to the Buck Act (but *not* to the Public Salary Tax Act) defines the term "income tax" broadly to include "any tax . . . measured by . . . income, or . . . gross receipts." § 110(c). And in *Howard* v. *Commissioners of Sinking Fund of Louisville*, 344 U. S. 624, 628–629 (1953), this Court held that a city's "license fee" measured by income and levied on employees working at a federal plant fell within this definition.

Nonetheless, the Buck Act does not apply here. Congress passed the Buck Act in 1940 because it was uncertain whether the consent to taxation provided in the 1939 Public Salary Tax Act would extend to income taxes on those who lived or worked in federal areas; Congress feared that these taxes would be barred for a special reason—namely, that States might lack jurisdiction to apply their laws to those who lived or worked in such areas. See S. Rep. No. 1625, 76th Cong., 3d Sess., 3 (1940). Consequently, the Buck Act's language consents to nothing. Rather, it says "[n]o person shall be *relieved*" of liability for "any income tax" by virtue of a particular circumstance, specifically, "by reason of" that person's "residing within a Federal area" or his "receiving income from transactions occurring or services performed"

in that "area." 4 U. S. C. § 106(a) (emphasis added). The Buck Act seeks to prevent a person who lives or works in a federal area from making a certain kind of legal defense to taxation, namely, the defense that the State lacks jurisdiction to impose an income tax upon a person who lives or works in such an area.

The Buck Act's very next phrase makes clear that the Act is limited so as to accomplish only the purpose I have just described. It says that the state or local

> "taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area . . . *to the same extent and with the same effect* as though such area was not a Federal area." *Ibid.* (emphasis added).

And the Buck Act adds that in any event, it "shall not be deemed to authorize the levy or collection of any tax on . . . the United States." § 107(a). Thus, the Buck Act's own language indicates that the Act is not intended to alter the contours of the intergovernmental tax immunity doctrine itself.

The case before us falls outside the Buck Act because no one here has asked to "be relieved" of tax liability *"by reason of* his residing within a Federal area or receiving income from . . . services performed in such area." § 106(a). Rather, the respondents claim that Jefferson County's ordinance is unconstitutional, not by reason of the federal nature of *where they work,* but by reason of the federal nature of *what they do.* And for the reasons discussed above, the county's ordinance would violate the intergovernmental tax immunity doctrine *whether or not* the respondents lived or worked in a federal area. The Buck Act cannot help the county's claim because it gives the State power to tax income earned in a federal area only "to the same extent" and "with the same effect as," not to a greater extent than, if that income were earned elsewhere. *Ibid.* Indeed, for the reasons I discussed earlier, Jefferson County's tax falls outside the Act because it is a "tax on . . . the United States." § 107(a).

Nor does the Court's decision in *Howard* govern the outcome here. As an initial matter, *Howard* considered only the jurisdictional issue I have referred to above and did not expressly discuss whether Louisville's tax nonetheless violated the intergovernmental tax immunity doctrine for reasons independent of *where* the federal employees lived or worked. 344 U. S., at 627–629; see also *id.*, at 626 (taxpayers argued that the tax was "invalid" as applied to them because the plant, being a federal enclave, was "not within the City"); *id.*, at 629 (taxpayers "conceded" that the city could "levy such a tax within its boundaries outside the federal area").

More importantly, the tax at issue in *Howard*, though styled a "license fee for the privilege of engaging in [certain] activities," Louisville Ordinance No. 83, § 1 (1950) (attachment to Lodging of Respondents, Mar. 25, 1999), differed from the tax at issue here in two critical ways. First, the Louisville ordinance at issue in *Howard* did not make it "unlawful" to *engage in work* without paying the tax. Compare Louisville Ordinance No. 83, § 1, with Jefferson County Ordinance No. 1120, § 2. And second, the Louisville ordinance did not exempt everyone who paid license fees under state law. Indeed, the ordinance specified that its license fee was to be paid *in addition to* certain other license fees imposed by the city or the State. Compare Louisville Ordinance No. 83, § 12, with Jefferson County Ordinance No. 1120, preamble, § 1(B). Thus, the provisions of the Louisville ordinance made clear that the tax it imposed was a separate and additional tax—not an alternative—to the licensing scheme already in place.

The Jefferson County ordinance is different from the Louisville ordinance in these significant respects. And as I have explained, it is the cumulative nature of the unusual aspects of the Jefferson County tax that make it an occupational or licensing tax.

\* \* \*

For these reasons, I would affirm the decision of the Court of Appeals.

## APPENDIX TO OPINION OF BREYER, J.

Persons and Businesses Subject to Alabama License
or Privilege Taxes*

Persons engaged in furnishing abstracts of title
Persons manufacturing acetylene gas and carbide
Actuaries, auditors, and public accountants
Persons engaged in selling adding machines, calculating machines, typewriters, etc.
Persons engaged in advertising
Persons who sell or install air-conditioning with water connections
Persons who sell or install air-conditioning without water connections
Owners/operators of amusement parks
Architects
Attorneys
Auctioneers
Dealers in automobiles, trucks, or other self-propelled vehicles
Automobile accessory dealers
Automobile garages or shops
Automobile storage garages
Automobile storage other than in garages
Automobile tire retreading shops
Barbers
Owners/lessees of baseball parks
Battery shops
Battery manufacturers
Beauty parlor operators
Persons who deal in, rent, or hire bicycles or motorcycles
Persons engaged in the business of making blueprints

---

*See Ala. Code §§ 40–12–40 *et seq.*, 40–16–4, 40–21–50, 40–21–52 through 40–21–55, 40–21–57 through 40–21–60 (1993); Ala. Code § 27–4–9 (1986). Each of these provisions is specifically mentioned among the exclusions in Jefferson County Ordinance No. 1120, § 1(B) (1987).

Bond makers

Persons engaged in manufacturing, producing, or bottling soda water, soft drinks, or fruit juices

Bowling alleys and tenpin alleys

Agents and brokers of iron or railway, furnace, or mining supplies

Persons operating plants that manufacture brooms, brushes, mops, etc.

Persons engaged in selling cereal or soft drinks in sealed containers at retail

Persons engaged in selling soft drinks via dispensing devices or taps

Persons engaged in selling soft drinks at wholesale

Certified public accountants

Retail dealers in cigars, cigarettes, snuff, tobacco, etc.

Wholesalers of cigars, cigarettes, snuff, tobacco, etc.

Persons operating circuses

Persons operating cleaning or pressing establishments (*e. g.,* dry cleaners)

Persons dealing in coal or coke and maintaining one or more "yards"

Persons who sell, distribute, haul, or deliver coal or coke by truck

Manufacturers of coffins or caskets

People who sell or solicit orders for coffins or caskets

Collection agencies

Commission merchants and merchandise brokers

Operators of for-profit concerts, public lectures, and musical entertainment

Persons engaged in discounting or buying conditional sales contracts, drafts, notes, or mortgages

Persons who engage in lending money on salaries or making industrial or personal loans

Contractors and construction companies

Persons whose principal business is buying cotton

Persons operating a compress for the purpose of compressing cotton

Persons operating various types of mills and factories

Persons who operate cotton warehouses

Credit agencies

Persons operating creosoting or other preservative wood treatment plants

Delicatessens

Dentists

Persons operating detective agencies or companies doing business as such

Persons engaged in developing and printing films or photographic plates

Devices for testing skill and strength used for profit

Persons compiling, selling, or offering for sale directories

Dealers in refrigerators, heaters, and stoves, and repair shops for such devices

Embalmers

Engineers

Owners/operators of fertilizer factories

Fertilizer mixing plants

Persons selling goods in insurance, bankruptcy, or close-out sales, or persons selling goods damaged by fire, etc.

Fireworks dealers

Flying jennies, merry-go-rounds, roller coasters, etc.

Fortunetellers, palmists, clairvoyants, astrologers, phrenologists, and crystal gazers

Fruit dealers (selling from fruit stands or stores)

Persons operating gas stations or pumps

Persons who sell glass

Persons operating golf or miniature golf courses

Persons operating hat-cleaning establishments

Dealers in hides or furs, other than cattle, sheep, goat, or horse hides

Horse shows, rodeos, or dog and pony shows

Persons engaged in buying, selling, or exchanging horses, mules, or donkeys

Wholesale ice cream manufacturers

Ice factories

Innkeepers and hotels

Junk dealers

Persons renting or supplying laundered towels, aprons, coats, or linens (not including diapers)

Persons furnishing diaper service

Persons or other entities operating power or steam laundries

Self-service laundries

Hand-power laundries

Exhibitions of feats of sleight of hand

Persons who sell or install lightning rods

Persons who sell or install lightning rods, though not as a primary business

Wholesale dealers of lumber and timber

Persons operating lumberyards

Persons operating machinery repair shops

Manicurists, hairdressers, etc.

Persons engaged in manufacturing, cleaning, or upholstering cushions, mattresses, pillows, or rugs

Persons engaged in the practice of medicine, chemistry, bacteriology, etc., except chemists employed full time by doctors or nonprofits and doctors who work full time at medical schools

Persons engaged in selling mimeographs, duplicating machines, dictaphones, teletypes, etc.

Persons engaged in iron ore mining

Persons who sell or erect monuments or tombstones (other than fraternal associations)

Persons operating transient moving picture shows (in tents or otherwise)

Persons operating moving picture shows

Persons operating newsstands

Oculists, optometrists, and opticians

Osteopaths and chiropractors

Cold storage plants, packinghouses, and refrigerated warehouses

Pawnbrokers

Itinerant vendors and peddlers who sell drugs, ointments, or medicines claimed to treat or cure diseases

Itinerant vendors and peddlers who sell spices, toilet articles, and household remedies, etc.

Photographers and photograph galleries

Transient or traveling photographers with no fixed place of business

Persons who sell, rent, or deliver pianos, organs, and small musical instruments

General merchants who sell small musical instruments

Pig iron storage operators

Persons dealing in handguns, knives, and other similar weapons

Persons and other entities that sell, store, use, or otherwise consume packages of playing cards

Plumbers, steam fitters, tin shop operators, etc.

Pool tables in commercial establishments

Owners of racetracks, athletic fields, etc., charging more than $0.50 admission

Persons who sell radios, etc.

Real estate brokers and agents dealing in realty within the State

Real estate brokers and agents dealing in realty outside the State

Restaurants, cafes, cafeterias, etc.

Roadhouses, nightclubs, and dance halls

Sandwich shops, barbecue stands, and hamburger or hot dog stands

Persons and corporations who operate sawmills, heading mills, or stave mills

Scientists, naturopaths, and chiropodists

Persons selling or delivering sewing machines

Operators of shooting galleries

Persons dealing in shotguns, rifles, and ammunition for such weapons

Skating rink operators

Soliciting brokers

Persons selling eyeglasses, other than nonprescription sunglasses

Stock and bond brokers

Operators of street fairs or carnivals

Owners, conductors, and people in charge of railroad supply cars from which goods are sold

Operators of syrup or sugar factories, plants, or refineries

Persons engaged in conducting a theater, vaudeville, or variety show or other performance

Ticket scalpers

Persons operating public tourist camps

Dealers in tractors, road machinery, or trailers

Persons who issue or sell trading stamps or similar certificates

Persons transferring freight

Transient dealers

Persons operating transient theatrical and vaudeville shows

Transient vendors and peddlers, traveling by animal or using a vehicle other than a motor vehicle

Persons operating turpentine stills

Persons and other entities operating vending machines

Persons and other entities engaged in the operation of veneer mills or any other factories where lumber or timber is made into a finished product

Veterinary surgeons

Persons operating warehouses or storage yards

Persons who purchase and receive or collect grease and animal byproducts for rendering or recycling

Persons operating public utilities

464

Persons and other entities operating freight lines or equipment companies (*i. e.*, by rail)

Railroad operators

Persons operating "express" shipping companies

Financial institutions