**CLUB ASSOCIATION OF WEST VIRGINIA, INC., et al., Plaintiffs,**

v.

**Robert E. WISE, Jr., in his official capacity as Governor of the State of West Virginia, et al., Defendants.**

**No. Civ.A. 2:01–0634.**

United States District Court, S.D. West Virginia.

Aug. 31, 2001.

Jeffrey V. Mehalic, Law Offices of Jeffrey V. Mehalic, Charleston, West Virginia, John P. Davis, III, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pennsylvania, for plaintiffs.

Thomas R. Goodwin, Johnny M. Knisely, II, Carrie Goodwin Fenwick, Goodwin & Goodwin, for defendants.

### *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

Pending is Defendants' motion to dismiss. The Court **GRANTS** the motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Introduction

On July 19, 2001 Plaintiffs filed an eleven (11) count Complaint challenging the

new Limited Video Lottery Act, *West Virginia Code* Sections 29–22B–101 to 1903, enacted by the Legislature during a 2001 Special Session. Employing a variety of state and federal constitutional claims, Plaintiffs seek "a permanent injunction enjoining defendants from implementing and enforcing the Limited Video Lottery Act." (Compl. at 42).

Defendants' motion to dismiss raises a host of challenges to the Court's subject matter jurisdiction. In the alternative, Defendants assert the Court should abstain from exercising any jurisdiction it might possess. Analysis of the legal arguments is aided by a preliminary discussion of West Virginia's 138–year history of regulating gambling devices and, to a lesser extent, its treatment of lotteries in general.

## A. West Virginia's Regulation of Gambling Devices and Lotteries (1863 to 1982)

In 1863, the Framers of the first *West Virginia Constitution* adopted a categorical ban on lotteries, stating "No lottery shall be authorized by law; and the buying, selling or transferring of tickets or chances in any lottery shall be prohibited." W.Va. Const. Art. XI, § 1 (1863). The 1863 Constitution was superseded in 1872, but the ban on lotteries remained intact. W.Va. Const. Art. VI, § 36 ("The legislature shall have no power to authorize lot-

teries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State."). The ban seems to have had its genesis in the Commonwealth's distaste for such enterprises. *See* Robert M. Bastress, *The West Virginia Constitution* 162 (1995) (noting the provision is "similar in substance to ... Article IV, Section 33 of the Virginia Constitution of 1851").[1]

The State's principal legislative effort to implement Section 36 can be found in Chapter 151 of the *West Virginia Code of 1887*. That Chapter, entitled "Offenses Against Public Policy[,]" prohibited everything from the establishment of a lottery to the keeping of a gaming table, "faro bank, or keno table, or a table of the like kind[.]" W.Va.Code c. 151, § 1;[2] *see generally id.* §§ 1–16. In the first century of the State's existence, the Supreme Court of Appeals of West Virginia confronted the general issue of gambling a number of times, most often in the context of Chapter 151 or its successor, Chapter 61, Article 10.

For example, in 1904 the Supreme Court of Appeals decided a pair of cases construing Chapter 151, Section 1. The cases dealt with slot machines, the progenitors of the modern video poker machines. First, in *State v. Gaughan,* 55 W.Va. 692, 48 S.E. 210 (1904), the Court very broadly interpreted Section 1 to prohibit slot machines.[3]

---

1. The ban was adopted without debate. Some have speculated on the reason for the ban:

   > One author has explained that lotteries fell out of favor in the 1800's because of "social problems, such as the impact that lotteries had on the morality and work ethic of the people, and fraudulent operation."

   Ronald J. Rychlak, *Lotteries, Revenues and Social Costs: A Historical Examination of State–Sponsored Gambling,* 34 B.C.L.Rev. 11, 32 (1992) (quoted in *State ex rel. Mountaineer*

*Park, Inc. v. Polan,* 190 W.Va. 276, 281, n. 7 438 S.E.2d 308, 313 n. 7 (1993)).

2. Like the constitutional provision it implemented, this statutory provision traces its roots to an earlier enactment of the Commonwealth dating to 1815. Philip Bonner Hill, Case Comment, *Gaming–Slot Machines as Gaming Devices Under West Virginia Statute,* 58 W.Va.L.R. 102, 103 (1955).

3. Section 1 was later amended in line with this broad construction. A 1923 amendment deleted the phrase "or table of like kind,

Although slot machines were not specifically mentioned in the statute,[4] *Gaughan* held *"no game* of unequal chances can be played anywhere lawfully." *Id.* at 697, 48 S.E. at 212 (emphasis added).

Paired with this expansive reading of the definition of a prohibited gambling device, however, was a decision the same year that practically slowed efforts to halt the proliferation of such devices. In Syllabus Point 3 of *Woods v. Cottrell,* 55 W.Va. 476, 476, 47 S.E. 275, 275 (1904), the West Virginia Court held when slot machines or other gaming devices are seized under Section 1, they can be destroyed only upon *conviction* of their owner under that Section.

Following *Gaughan* and its progeny of fifty years, it seemed "settled" in 1955 "that 'a one-armed bandit' slot machine [wa]s a 'gaming device of like kind'" as defined in *West Virginia Code* 61–10–1. Philip Bonner Hill, *supra* at 104. In *State v. Calandros,* 140 W.Va. 720, 86 S.E.2d 242 (1955), however, a public-policy shift appears to have occurred. Calandros was convicted under Section 61–10–1 for placing a slot machine in the "Believe It or Not Restaurant" in Ripley, West Virginia. The circumstances of the case, and Calandros' defense, were to become quite familiar in the decades that followed:

> Defendant testified . . . *the gaming device was never intended to be used in gambling;* that he had placed a sign on the front of the device which read, 'For Amusement Only', when the gaming device was installed in the clubroom; and to his knowledge the device was a 'free game' device.

The gaming table was electrically operated. It could be played for either five or twenty-five cents. After a coin had been inserted, a lever or handle on the center front was 'tripped', which caused three discs or reels in the cabinet to spin. Each reel had a number of pictures or figures representing oranges, lemons, plums, cherries, bells, and bars upon them. In order to win, it was necessary that a certain combination of those pictures be in line on the three reels when the reels stopped turning. *The device did not pay money, but a winner was paid in some instances by an employee of the club.*

*Id.* at 721–22, 86 S.E.2d at 243 (emphasis added).

The West Virginia Court essentially agreed with Calandros and, in the process, seemingly abandoned well-established precedent originating with *Gaughan:*

> The evidence . . . does not establish that the device in question was either an 'A.B.C. or E.O. table, or faro bank, or keno table, or any other gaming table or device of like kind ***'. The device in question is referred to in the testimony as being similar to a 'slot machine' or a 'one armed bandit'; *but we cannot assume that such devices are of 'like kind' to those named in the statute. The mere fact that the device could possibly be used or adapted to gambling, does not make it of 'like kind'.* The burden was on the State to establish that the table or device involved in this proceeding was one condemned by the statute.

under any denomination." It replaced that language with the words "or any other gaming table or *device* of like kind, under any denomination, *or which has no name* [.]" W.Va.Code § 61–10–1 (1955) (emphasis added).

4. The Section prohibited in pertinent part the keeping or exhibition of "a gaming table, commonly called A.B.C., or E.O. table or faro bank, or keno table, or table of like kind, under any denomination[.]" W.Va.Code c. 151, § 1 (1887).

*Id.* at 728, 86 S.E.2d at 247.[5] Chief Justice Lovins dissented, perhaps sparking a debate that has continued in one form or another for decades. Based on what he believed to be "well established and time-tried principles" since *Gaughan, id.* at 731, 48 S.E. 210, he observed:

> The method of operation was such that the chances for the player to win were unequal. The record clearly establishes such unequality. A game of that character cannot be lawfully played at any place.

*Id.* at 729, 86 S.E.2d at 247.

In 1970, the Legislature superseded *Calandros* by statute. Analogous to the mixed signals of the West Virginia Court in 1904, the Legislature expanded the list of prohibited gambling devices, but then practically confounded enforcement mechanisms. In sum, the outdated Section 61–10–1 was amended to cover "any slot machine, multiple coin console machine, multiple coin console slot machine or device in the nature of a slot machine," while also providing:

> [T]*he provisions of this section shall not extend to coin-operated nonpayout ma-*

chines with free play feature or to automatic weighing, measuring, musical and vending machines which are so constructed as to give a certain uniform and fair return in value or services for each coin deposited therein and in which there is no element of chance.

W.Va.Code § 61–10–1 (emphasis added). In the years following the amendment, the State continued to struggle with the regulation of the machines and enforcement under amended Section 61–10–1.

In *State v. Wassick,* 156 W.Va. 128, 191 S.E.2d 283 (1972), defendant was convicted of violating Section 61–10–11 prohibiting any person from setting up, promoting, or managing a lottery for anything of value. Defendant owned a multiple-coin pinball machine located in a tavern known as Jean and John's Place. In March 1969 an undercover police officer received a payoff of $2.00 from the tavern owner after the officer registered a number of free games on the machine. Defendant asserted his ownership of the machine, which lacked a built-in pay-out mechanism, did not constitute a lottery. After noting the key elements of a lottery are consideration, prize and chance, the West Virginia Court held

---

**5.** This seeming public-policy shift was not without precedent. For example, in *State v. Brast,* 31 W.Va. 380, 7 S.E. 11 (1888), the West Virginia Court interpreted Chapter 151, Section 4, which prohibited gaming at a hotel or other public place, as not prohibiting playing poker in a hotel room with the door locked. In the process, Justice Snyder suggested the statute made no moral judgments about the wisdom of gambling: "This provision is not intended to suppress gaming *as a vice per se,* but to prevent it from becoming an annoyance and a nuisance to the public, or persons not participating in it." *Id.* at 384, 7 S.E. at 13 (emphasis added). A half century later, however, the West Virginia Court noted *West Virginia Code* Section 61–10–10 was "based upon a sound public policy to discourage *gambling and the attendant vices,* and obeying the legislative inhibition could not be classed as a discrimination." *State v. Chesa-*

*peake & Potomac Tel. Co. of W. Va.,* 121 W.Va. 420, 423, 4 S.E.2d 257, 258 (1939) (emphasis added); *see also Tweel v. West Virginia Racing Comm'n,* 138 W.Va. 531, 541, 76 S.E.2d 874, 880 (1953) ("From the birth of this State, wagering or betting in almost every form has been regarded *as of evil tendency* and made illegal.") (emphasis added); *State v. Hudson,* 128 W.Va. 655, 665, 37 S.E.2d 553, 558 (1946) (stating "A scheme or device may constitute a lottery although it may not amount to *a widespread pestilence,* an expression used by some courts in considering the characteristics or elements of a lottery" and "In general lotteries are judicially condemned as *particularly vicious* in comparison with other forms of gambling because of their public nature and *the contaminating and unwholesome influence* which they produce in a community in which they flourish.") (emphasis added).

free plays on the machine at issue constituted a prohibited prize. The holding, however, appeared in obvious tension with the "free play" proviso added by the Legislature to Section 61–10–1 in 1970.

The next significant development was *State v. 25 Slot Machines*, 163 W.Va. 459, 256 S.E.2d 595 (1979). In that case, the Supreme Court of Appeals addressed the seizure and proposed destruction of gambling devices from four fraternal organizations in Brooke County. The proposed destruction under Section 61–10–1, however, was in seeming conflict with the 1904 ruling in *Woods* and its progeny.[6] The West Virginia Court thus overruled that line of authority:

> We disagree with these cases insofar as they compel prior conviction of one accused of keeping or exhibiting slot machines before the machines can be destroyed. Nothing in the statute even implies such a proposition.

*Id.* at 462, 256 S.E.2d at 597. Thus the Supreme Court of Appeals changed the course of the law once again, via Syllabus Points 1 and 2:

> 1. Devices listed in W.Va.Code, 61–10–1 are *prima facie contraband* when seized on a warrant alleging use for gaming and may be destroyed without the prior conviction of their owner or owners for using them for gaming. We expressly overrule Pt. 3, Syllabus, *Woods v. Cottrell*, 55 W.Va. 476, 47 S.E. 275 (1904).
>
> 2. Before a gambling device may be destroyed under Code, 61–10–1 notice

must be given to those in whose possession the device was found, and hearing given anyone who appears and claims ownership. *The possessor must prove by a preponderance of the evidence that the device was being kept or exhibited innocently, not for gambling purposes. If no one appears to vouch its purity or if those who do appear do not carry their burden of proof the device may be destroyed.*

*Id.* at 459, 256 S.E.2d at 596 (emphasis added).

## B. The Easing or the Constitutional Restriction on Lotteries and New Issues Raised by Advanced Technology (1983 to 1997)

A watershed development occurred in 1983 when the Legislature approved a state-run lottery amendment to the West Virginia Constitution. On November 6, 1984, the citizenry ratified the change, and Article VI, Section 36 officially put the State in the lottery business:

> The legislature shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets in this State; except that the legislature may authorize lotteries which are regulated, controlled, owned and operated by the State of West Virginia in the manner provided by general law. . . .

W.Va. Const. Art. VI, § 36.

The Legislature acted quickly to implement the amendment by enacting the

6. As noted by Justice Harshbarger, the case took some odd procedural turns, once again indicating the peculiar challenge facing law enforcement in regulating the machines and enforcing the statute:

> The petition alleged that the State did not know who owned [the machines]. The machines had benevolent friends who employed counsel for them. Acting upon his

advice they admitted that the State did not have sufficient information to ascertain ownership. However, the machines would or could not divulge who owned them. The State moved to strike the reply because the mechanisms lacked standing to contest their own destruction.

*Id.* at 460, 256 S.E.2d at 597.

State Lottery Act, *West Virginia Code* Section 29–22–1 *et seq.* From its humble beginning with a latex scratch-off ticket game in January 1986, the Legislature and the Lottery Commission have gradually expanded on the concept such that the Lottery is now a prime source of much needed revenue for the State.

In 1989, video poker machines appeared on the legal landscape for the first time in *Buzzo v. City of Fairmont,* 181 W.Va. 87, 380 S.E.2d 439 (1989). Akin to the holding in *Twenty Five Slot Machines* a decade earlier, Syllabus Point 2 held:

> Electronic video poker machines are not illegal *per se,* but fall within the exemption of W.Va.Code § 61–10–1 [1970] and are not subject to seizure and forfeiture under the statute unless evidence of *use* for illegal gambling purposes is established.

Syl. Pt. 2, 181 W.Va. at 87, 380 S.E.2d at 439 (emphasis added).

A few years later, on a certified question from the United States District Court for the Northern District of West Virginia, the Supreme Court of Appeals held:

> It is gambling prohibited by W.Va.Code, 61–10–1 [1970] to use a video poker machine that does not disburse money directly but is equipped with a free play feature when the player is reimbursed in money or any other thing of value except free plays for accumulated free plays.

Syl. Pt. 2, *United States v. Dobkin,* 188 W.Va. 209, 210, 423 S.E.2d 612, 613 (1992).[7]

One year later, the West Virginia Lottery Commission undertook a substantial expansion of the lottery, initiating an electronic video lottery game pilot project at Mountaineer Park thoroughbred racetrack. Characterizing the proposed expansion as "a far-reaching scheme to raise revenue[,]" however, the Supreme Court of Appeals reined in the Commission in *State ex rel. Mountaineer Park, Inc. v. Polan,* 190 W.Va. 276, 438 S.E.2d 308 (1993). Noting "[o]ur legislature ... has yet to even define electronic video lottery, much less explicitly authorize it[,]" the West Virginia Court held:

> Thus, because the legislature has not enacted general laws for the regulation, control, ownership and operation of electronic video lottery, and because the legislature failed to prescribe adequate standards in the State Lottery Act to guide the Lottery Commission in the exercise of the power conferred upon it with respect to electronic video lottery, the Lottery Commission was without authority under the Constitution to establish electronic video lottery.

*Id.* at 285–86, 438 S.E.2d at 317–18. Of greater significance, however, is the strong dicta contained in *Polan:*

> The fact that electronic video lottery is different from the common state-run lottery games, and has been defined as "video poker, keno and blackjack," also raises a question *as to whether electronic video lottery is actually a lottery as contemplated by W.Va. Const. art. VI, § 36.* West Virginia law prohibits gambling, W.Va.Code, 61–10–1 to 61–10–31.
>
> . . . .
>
> While we recognize that the voters, upon ratifying the amendment to article VI, section 36 of the *West Virginia Consti-*

---

**7.** In *Dobkin,* Judge Stamp appears to have recognized the State's paramount interest in the regulation of gambling in general and video poker machines in particular. *Dobkin* was a federal criminal case in which defendant was indicted under 18 U.S.C. §§ 1955 and 1956(a)(1) based upon a predicate state law violation of Section 61–10–1. *Dobkin* appears to be the only criminal case where the federal forum certified a question of law to the Supreme Court of Appeals of West Virginia.

*tution*, authorized the legislature to pass laws establishing a state-run lottery, *we question whether the voters were approving video lottery operations. There is nothing in the record before us which indicates that electronic video lottery was contemplated or even existed at the time voters approved the lottery amendment in 1984.*

*Id.* at 284 and 286 n. 22, 438 S.E.2d at 316 and 318 n. 22 (emphasis added).[8]

As with *Calandros* and Section 61–10–1 nearly two decades earlier, the Legislature quickly addressed *Polan* and enacted the Racetrack Video Lottery Act, *West Virginia Code* Sections 29–2A–1 *et seq.* The legislative findings supporting the Act, in part, suggest the reasons for its adoption:

> The Legislature finds and declares that the existing pari-mutuel racing facilities in West Virginia provide a valuable tourism resource for this state and *provide significant economic benefits to the citizens of this state through the provision of jobs and the generation of state revenues;* that this valuable tourism resource is threatened because of a general decline in the racing industry and because of increasing competition from racing facilities and lottery products offered by neighboring states; and that *the survival of West Virginia's pari-mutuel racing industry is in jeopardy unless modern lottery games are authorized at the racetracks.*

W.Va.Code § 29–22A–2 (emphasis added).

Notably, the Act did nothing to address the problem of the video poker and gambling machines located in private establishments, other than racetracks, throughout the State. The enforcement difficulties engendered by uneven judicial pronouncements and conflicting legislative regulation associated with the "gray machines[,]"[9] namely that they were *prima facie* but not *per se* illegal, thus continued. Although bills were introduced in the Legislature from 1995 forward to deal with lottery or gambling issues in general, no substantial changes resulted until now.

## C. Failed Legislative Attempts at Comprehensive Change and Enforcement (1998–2000)

In 1998 and 1999 the Legislature commissioned a special interim study of gaming. Its delegated committee met monthly to review evidence and testimony from the Alcohol Beverage Control Administration, the Lottery Commission, bar owners, pro- and anti-gambling interests, the Internal Revenue Service, and others concerning the issue of gray machines. According to a *Census of Gray Poker Machines* submitted to the Committee in 1999, about 10,000 of the devices were found at private establishments all over the State, from "Fat Daddy's Food Store" in Princeton to the "Stop-n-Git" in Beech Bottom, and most points in between. By early 2001, this number had increased to 13,524.

The Legislature thus recognized the need to take action, but its attempts at resolution failed. During the 2000 legislative session, Senate Bill 523, entitled the

---

**8.** Count VI of the instant Complaint, tracking the issue broached in *Polan,* raises this very complex issue under the *West Virginia Constitution,* as yet undecided by the West Virginia Court.

**9.** The term describes any machine capable of providing play for games of chance. Possession of such non-State owned machines is legal, so long as there is no payout from their play. As the Legislature has recognized, however, payouts occur frequently. The enforcement problem arises from the diseconomy of allocating scarce investigative and prosecutorial resources when the governing statutes impose only very lenient penalties on those who operate illegally.

"Restricted Access Adult Video Lottery Act" passed the Senate but failed to emerge from the House Judiciary Committee.

### D. The Limited Video Lottery Act (2001)

In his first state of the State address to the citizenry and the three branches of State government in February 2001, Governor Wise stressed a bleak budgetary outlook:

> Since taking office I have instructed my department heads and staff to help me study the financial status of our state government. Ladies and gentlemen, the cupboard is bare. Despite the 3 percent budget cut which I was forced to impose on the first day of my term, we are looking at a state budget with minimal growth for the next year.

Governor Robert E. Wise, Jr. State of the State Address, State Capitol (Feb. 14, 2001). At the same time, however, the Governor identified a new and potentially significant stream of revenue to remedy the problem:

> I am presenting you tonight with a budget that is in balance, and that begins to make the investments we must make. It is a budget with no fat, no frills, and no nonsense. It is a budget that makes tough decisions. It is a budget that says the irresponsible practices that got us in this situation will not be tolerated again.
>
> . . . .
>
> We can fund these investments in our future, and at the same time address an issue that troubles many West Virginia families, by imposing restrictions and regulations on video gambling.

*Id.* The Governor also candidly shared the historical failures in regulating the gambling industry in the State and the core police-power frustrations raised by past regulatory efforts:

> *Every attempt to regulate this industry has been stopped,* sometimes by people who claim that regulating it would "expand gambling." It would be difficult to devise any way to expand gambling any more than has happened in the past four years. It can't get any worse. This illegal industry grosses as much as a half a billion dollars a year.
>
> The current situation, more than anything else, breeds disrespect for the law. *When the state gives a wink and a nod to an industry that is clearly in violation of the laws, it sends a message that we are not serious about the rule of law.* If we expect to raise up a generation of West Virginians with the character to build a better society, we must set a better example.
>
> My proposal will do something *no one has done before—reduce, restrict and regulate the gray machines—and provide a steady new stream of income to finance the PROMISE Scholarship, other education efforts and the infrastructure necessary to build West Virginia.*
>
> I look forward to working with you. But this must be the legislative session that *finally* acts to control these machines.

*Id.* (emphasis added).

What followed was a legislative session dominated by the video lottery issue. *See* Phil Kabler, *Wise Gamble Pays Off: Lawmakers Pass Governor's Bill to Regulate Gray Machines* (Apr. 22, 2001) ("Few legislative sessions have ever been so dominated by one polarizing issue.").

Despite their determined efforts, House and Senate Conferees could not reach a compromise during the 60–day Regular Session. An accord was reached, however, during a special session that followed. After decades of public-policy wrestling in all three Branches, the Limited Video Lottery

Act, *West Virginia Code* Sections 29–22B–101 to 1903, became law on April 21, 2001. The enactment fundamentally alters the regulation of video poker and gambling machines. For example, State law now clearly provides "video gambling machines are per se illegal gambling devices which may be seized and destroyed as illegal contraband by any law-enforcement agency having jurisdiction[.]" W.Va.Code § 29–22B–1801. Further, the unauthorized possession of a video gambling device is now punishable as a felony with graduated penalties. *Id.* § 29–22B–1705.

The LVLA also will augment significantly the State's coffers. The Court requested supplemental briefing on this issue. The affidavit of Virgil Helton, Chief Financial Officer of the Lottery Commission, predicts:

1. Enrolled House Bill 102, containing the LVLA and amendments to other impacted statutes, establishes or increases five separate and distinct sources of revenue;

2. Associated amendments to the Racetrack Video Lottery Act increasing the maximum bet on video lottery terminals will result in a net increase in State revenue of $81,000,000.00 per year;

3. The LVLA adds four sources of revenue from licensing fees, permit fees, bidding fees and the State's share of video lottery revenue;

4. Total licensing fees for the current fiscal year will be $1,280,000.00;

5. Total permit fees for the current fiscal year will be $8,800,000.00;

6. Total bidding fees for the current fiscal year will be between $4,600,000.00 and $13,800,000.00;

7. With 9,000 authorized terminals, the State's revenue share *each day* will be approximately $250,000.00 and tens of millions of dollars each year; and

8. The proceeds from the Lottery are not a part of the State's general revenue, but are instead special revenue earmarked for specific purposes. For Fiscal Year 2002, the Legislature has appropriated the increased revenue resulting from House Bill 102 to fund teachers', correctional officers', and other state employees' pay raises; and

9. Beginning in Fiscal Year 2003, LVLA revenues will fuel substantial educational and infrastructure endeavors, including the new Promise Scholarship Fund.

Despite the promise of this significant new revenue source, the controversy surrounding the new law continues. Some have proposed yet another special session to revisit problems with the law, and some have suggested the law might even be repealed if the Legislature took it up anew. Court challenges, like this one, ineluctably follow.

To recount, on July 19, 2001 Plaintiffs filed an eleven (11) count challenge to the LVLA. They seek injunctive relief barring enforcement of the new law and a declaration that it is unconstitutional.[10]

An analysis of the Complaint, however, reveals mostly state law claims arising under the *West Virginia Constitution.* Fur-

10. Plaintiffs sought a preliminary injunction contemporaneous with the filing of their Complaint. The Court was prepared to conduct an expedited hearing on the matter until Defendants filed their motion to dismiss. The complexity of the motion, along with the potential disruption of the state fisc and administrative licensing and enforcement efforts, however, counseled in favor of expedited resolution of the jurisdictional issues first.

thermore, while the federal claims charge the LVLA unfairly restricts their freedom of association under the First Amendment, along with violations of the Privileges and Immunities, Equal Protection, Due Process and Commerce Clauses, the "wherefore" clause in each *federal* claim also asserts an alternative violation of the *West Virginia Constitution.* From one viewpoint, then, all eleven counts allege violations of the *West Virginia Constitution* in addition to five federal constitutional claims. Defendants moved to dismiss on jurisdictional grounds. The motion asserts this action is barred by (1) the Eleventh Amendment; (2) the Tax Injunction Act, (3) Article III standing principles; and (4) doctrines of abstention.

The Court concludes *infra* the federal action is barred by the Tax Injunction Act. Even were the Tax Injunction Act inapplicable, and the alternative Eleventh Amendment and standing arguments overcome, *Pullman* abstention also requires the State constitutional claims be resolved first by the Supreme Court of Appeals of West Virginia.

## II. DISCUSSION

### A. Tax Injunction Act

■ The Tax Injunction Act, 28 U.S.C. § 1341, provides:

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

*Id.* Our Court of Appeals has observed "This statutory provision is a jurisdictional bar that is not subject to waiver, and the federal courts are duty-bound to investigate the application of the Tax Injunction Act regardless of whether the parties raise it as an issue." *Folio v. City of Clarksburg,* 134 F.3d 1211, 1214 (4th Cir.1998).

The Supreme Court has consistently applied the Act as written, often discussing its important role in our system of cooperative federalism. Justice Ginsburg, writing for the majority in *Jefferson County v. Acker,* 527 U.S. 423, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999), recently reiterated the Act's text " 'is to be enforced according to its terms' and should be interpreted to advance 'its purpose' of 'confin[ing] federal-court intervention in state government.' " *Id.* at 433, 119 S.Ct. 2069 (quoting *Arkansas v. Farm Credit Servs. of Central Ark.,* 520 U.S. 821, 826–827, 117 S.Ct. 1776, 138 L.Ed.2d 34 (1997)). Justice Ginsburg further observed the Act is not simply a bar to injunctive relief:

By its terms, the Act bars *anticipatory relief.* Recognizing that there is "little practical difference" between an injunction and anticipatory relief in the form of a declaratory judgment, the Court has held that declaratory relief falls within the Act's compass.

*Id.* (emphasis added) (quoting *California v. Grace Brethren Church,* 457 U.S. 393, 408, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982)).

Justice Scalia's observations likewise evince a philosophy that the Act is concerned with substance over form when the issue involves state fiscal policy:

In my view the Tax Injunction Act itself reflects a congressional judgment, with which I agree, that unlawful interference with state tax collection always entails th[e] likelihood [of irreparable harm]. It produces in all cases not merely the possibility of ultimate noncollection because of the taxpayer's exhaustion of the funds but also an interference with the State's orderly management of its fiscal affairs.

*Barnes v. E–Systems, Inc. Group Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301,

1304, 112 S.Ct. 1, 115 L.Ed.2d 1087 (1991) (granting a stay as Circuit Justice under 28 U.S.C. § 2101(f)).

The case law interpreting the Act is littered with cautionary admonitions concerning interference in state taxation matters, even where the *Ex Parte Young* exception might otherwise apply:

Enactment of the Tax Injunction Act of 1937 reflects a congressional concern to confine federal court intervention in state government, a concern prominent after the Court's ruling in *Ex parte Young* ..., that the Eleventh Amendment is not in all cases a bar to federal court interference with individual state officers alleged to have acted in violation of federal law. Given the systemic importance of the *federal balance, and given the basic principle that statutory language is to be enforced according to its terms, federal courts must guard against interpretations of the Tax Injunction Act which might defeat its *purpose and* text.

....

The Tax Injunction Act is grounded in the need of States to administer their fiscal affairs without undue interference from federal courts.

*Farm Credit,* 520 U.S. at 832, 117 S.Ct. 1776 (emphasis added).

Our Court of Appeals has addressed the Tax Injunction Act in two recent, instructive cases. Along with the many decisions preceding them, both focus on the purpose behind the Act rather than employing a technical reading of its terms as a means to circumvent its breadth. In *Valero Terrestrial Corp. v. Caffrey,* 205 F.3d 130 (4th Cir.2000), affected persons sued West Virginia officials for declaratory and injunctive relief, contending a solid waste assessment charge imposed pursuant to West Virginia's Landfill Closure Act violated the Commerce Clause and substantive due process. First, the Court of Appeals noted

the label applied by the Legislature is not determinative:

The TIA represents a recognition that states are best situated to administer their own fiscal operations. As such, the term "tax" is subject to a "broader" interpretation when reviewed under the aegis of the TIA.

The West Virginia charge at issue here is defined as a "fee" in the pertinent subsection of the statute. However, the nomenclature provided to the charge at issue *is not material as the inquiry focuses on explicit factual circumstances that transcend the literal meaning of the terminology.*

*Id.* at 133–134 (citations omitted) (emphasis added). The Court of Appeals then set forth the test for determining whether a particular charge is within the Act's prohibition:

To determine whether a particular charge is a "fee" or a "tax," the general inquiry is to assess whether the charge is for revenue raising purposes, making it a "tax," or for regulatory or punitive purposes, making it a "fee." To aid this analysis, courts have developed a three-part test that looks to different factors: (1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge.

In *San Juan Cellular,* the court set out the precise confines of a "classic tax" versus a "classic fee." The "classic tax" is imposed by the legislature upon a large segment of society, and is spent to benefit the community at large. The "classic fee" is imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes, or to raise "money placed in a special fund to defray the agency's regulation-related expenses."

The *San Juan Cellular* court noted that most charges will not fall neatly into either extremity and the characteristics of the charge will tend to place it somewhere in the middle.

When the three-part inquiry yields a result that places the charge somewhere in the middle ... *the most important factor becomes the purpose behind the statute, or regulation, which imposes the charge. In those circumstances if the ultimate use of the revenue benefits the general public then the charge will qualify as a "tax," while if the benefits are more narrowly circumscribed then the charge will more likely qualify as a "fee."*

*Id.* at 134 (citations omitted) (emphasis added).[11] After concluding the first two parts of the test indicated the presence of a tax as opposed to a fee, the Court of Appeals observed:

The last part of the test also yields to the conclusion that the charge is a "tax" because *the benefits of the charge touch a large segment of the West Virginia population.* The statute was passed pursuant to an EPA regulation that sought to reduce the hazard of contaminated landfills. The aim of the West Virginia statute is to enable those landfill owners, who cannot for financial reasons comply with EPA regulations, close or upgrade said landfills to non-hazardous levels. Thus, *it is the environmen-*

*tal safety of West Virginia's groundwater that is the paramount purpose of the § 22–16–4(a) charge and it cannot be said that such purpose serves a small section of society.*

*Id.* at 134–35 (emphasis added). Appellants challenged a tax finding on the basis "that the revenue raised by § 22–16–4(a) is deposited into a special fund and used for a specific purpose." *Id.* at 135. The Court of Appeals dispatched that contention:

By such reasoning, appellants are *elevating form over substance* in denigration of the central holding of *San Juan Cellular* that mandates an examination of the use and purpose of the charge rather then a cursory review of where the revenue is placed or how the charge is referred to in the promulgating document. Moreover, the fact that revenue is placed in a special fund is not enough reason on its own to warrant characterizing a charge as a "fee." *If the revenue of the special fund is used to benefit the population at large then the segregation of the revenue to a special fund is immaterial. Thus, when revenue is placed in a special fund the further inquiry must be whether the money is used "to benefit regulated entities, ... to defray the cost of regulation" (making it resemble a "fee") or else to benefit the general public.*

11. Judge Michael, writing for the majority in *Collins Holding Corp. v. Jasper County,* 123 F.3d 797 (4th Cir.1997), expands on the tax/fee analysis:

It is useful to begin with a look at who imposes, administers, and collects the assessment. An assessment imposed directly by a legislature is more likely to be a tax than one imposed by an administrative agency. If responsibility for administering and collecting the assessment lies with the general tax assessor, it is more likely to be a tax; if this responsibility lies with a regula-

tory agency, it is more likely to be a fee. But the heart of the inquiry centers on function, requiring an analysis of the purpose and ultimate use of the assessment. If the revenue is paid into the state's (or county's) general fund and provides a general benefit to the public, it sounds like a tax. If, on the other hand, the assessment covers only a narrow class of persons and is paid into a special fund to benefit regulated entities or defray the cost of regulation, it sounds like a fee.
*Id.* at 800.

*Id.* (citations omitted) (emphasis added). The Court of Appeals ultimately affirmed dismissal of the action based on application of the Act.

In *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298 (4th Cir.2000), the appellants were charged property taxes by a public service district even though the district did not provide them with water or sewer service. Their amended complaint raised (1) Section 1983 claims for an unlawful taking and violation of their rights to equal protection arising from the allegedly unauthorized collections of real and personal property taxes; (2) a Section 1985 claim for conspiracy to effectuate the allegedly unauthorized collection of taxes, thereby depriving appellants of equal protection and protected privileges and immunities; and (3) an unlawful taking of property by the allegedly unauthorized collection of taxes, in violation of the South Carolina and United States Constitutions. Appellants sought a refund, damages, injunctive relief, and attorneys' fees.

The Court of Appeals revisited the policies underlying the Act:

> The Act thus reflects the importance of the taxing power to the operation of state governments and Congress's desire to keep federal courts from unduly interfering with state revenue collection. *See Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 799 (4th Cir.1997); *see also National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 586, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible.") (quoting *Dows v. Chicago*,

78 U.S. (11 Wall.) 108, 110, 20 L.Ed. 65 (18701)).

. . . .

> On its face, the Act bars suits in federal court for injunctive relief in state tax cases. See 28 U.S.C. § 1341. Although not obvious from the face of the statute, the Act also bars suits for declaratory relief in state tax cases.

*Id.* at 301, 301–02 (emphasis added); *see also Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 799 (4th Cir.1997). The Court of Appeals also noted the related "comity concerns [that] had motivated Congress's passage of the Act, and that the comity principle survived the Act's enactment." *Id.* Ultimately, the Court of Appeals held the action barred by the Act and comity concerns.

■ With these principles in mind, the Court first addresses whether the LVLA imposes taxes or fees. Our Court of Appeals has previously recognized the line separating the two "can be a blurry one." *Collins Holding*, 123 F.3d at 800.

At the outset, it is important to note that if the license, permit, bidding fees or the State's share of the revenue from the LVLA, are found to be taxes, the Act would divest the Court of jurisdiction. The Court thus first examines the license fees which, as concluded *infra*, are ultimately determinative of the jurisdictional question.

The license fees are covered under *West Virginia Code* Section 29–22B–518, which provides in pertinent part:

> (a) The following license fees shall be paid annually by each licensed operator, manufacturer, service technician or limited video lottery retailer:
>
> (1) Operator: $10,000;
>
> (2) Manufacturer: $10,000;
>
> (3) Service technician: $100;

(4) Limited video lottery retailer: $500.

(b) The applicable fee shall be paid to the commission at the time the application for a license is submitted to the commission and upon the annual renewal date each year thereafter, at which time the license may be renewed.

. . . .

(d) License fees collected under this section *shall be deposited in the fund established in section 29–22–18a.*

W.Va.Code § 29–22B–518.

The "fund established in section 29–22–18a" is the State excess lottery revenue fund (the Fund). The Fund has the following characteristics:

1. It is a special revenue fund within the state lottery fund in the state treasury;

2. Its revenue is not to be treated by the auditor or treasurer as part of the general revenue of the State;

3. The revenue from the Fund is disbursed as follows:

   a. For Fiscal Year 2002 (beginning July 1, 2001), to subsidize salary increases and benefits for teachers, state police personnel, and general salary increases for state employees. For Fiscal Year 2002, the Lottery Commission, at the Governor's direction, shall transfer the moneys of the account to the state general revenue fund in the amounts specified in the Governor's official revenue estimates to subsidize the salary increases. After these funding requirements are met, the monies in the fund

are disbursed as follows for Fiscal Year 2002:

i. $5,500,000.00 into a State treasury "education improvement fund" for appropriation by the Legislature to the "Promise Scholarship Fund [12];"

ii. $25,000,000.00 to the school building debt service fund;

iii. $25,000,000.00 to the West Virginia infrastructure fund;

iv. $10,000,000.00 into an account in the state lottery fund to be known as the higher education improvement fund; and

v. $9,000,000.00 into an account in the state lottery fund to be known as the state park improvement fund for park improvements.

*See id.* Section 29–22–18a goes on to spell out further earmarks for Fiscal Year 2001 and beyond.

In analyzing the license charges, the Court first notes the statute refers to them as fees rather than taxes. As cautioned repeatedly by our Court of Appeals, however, the state label applied to the charge is not determinative.

Label aside, the license charges resemble taxes in many respects. First, the charge appears to be imposed primarily for revenue-generation purposes. The entity imposing the charge is the Legislature, not the Lottery Commission. Further, the proceeds from the charge are placed into the Fund, which is earmarked for many causes beneficial to all West Virginians either directly or indirectly. The Fund receiving the license charges contributes monies to (1) the Promise

**12.** This Program was approved by the Legislature two years ago but not funded. It offers each West Virginia high school graduate who completes school with a "B" or better grade average a full-tuition scholarship to a state college or university or an equivalent dollar scholarship to an in-state private college.

Scholarship Fund, (2) the school building debt service fund, (3) the West Virginia infra-structure fund, (4) the higher education improvement fund, and (5) the state park improvement fund. It also funds salary increases for key personnel such as teachers. The retention and job satisfaction of such individuals benefit tens of thousands of children across the State every year. The LVLA thus closely resembles a classic tax.

Nonetheless the charge suggests some elements of a fee. The charge is administered and collected by the Lottery Commission which, however, is a division of the State Department of Tax and Revenue. More significantly, the population subject to the charges is comprised only of those persons seeking a license. With these slightly countervailing features in mind, the charge may fall somewhere between the two extremes of a classic tax and classic fee.

Pursuant to *Caffrey*, then, the most important factor becomes the purpose behind the statute imposing the charge. Here, the license fee facilitates the control and regulation of a large segment of gambling devices, regulation of which West Virginia has struggled with for decades. Controlling the proliferation of these devices benefits a large segment of the population. As noted above, in his state of the State address Governor Wise encouraged the Legislature to join him in "address[ing] an issue that troubles many West Virginia families, by imposing restrictions and regulations on video gambling." Also, as noted above, the statute provides revenue that ultimately will benefit most West Vir-

ginians. The license fee thus bears almost all the important hallmarks of a tax.[13]

Having found a tax present, the question still remains as to whether Plaintiffs have a plain, adequate, and complete remedy available to them in state court. The standard was discussed in *Lawyer:*

> The "plain, adequate, and complete" exception requires a state court remedy "that meets certain minimal procedural criteria." *Folio v. City of Clarksburg,* 134 F.3d 1211, 1214 (4th Cir.1998) (quoting *Rosewell,* 450 U.S. at 512, 101 S.Ct. 1221). The issue is whether the state remedy "provides the taxpayer with a *'full hearing and judicial determination'* at which [the taxpayer] may raise any and all constitutional objections to the tax."

*Lawyer,* 220 F.3d at 304 (emphasis added); *see also Folio,* 134 F.3d at 1214 ("Stated differently, the taxpayer is entitled to a meaningful opportunity to assert federal constitutional challenges to the tax in state court.").

Plaintiffs do not appear to contest seriously the adequacy of the State forum. The West Virginia courts plainly are able to address and resolve all of the federal, as well as the State, constitutional claims in a speedy and efficacious manner. Recent precedent demonstrates even Commerce Clause and First Amendment issues often find their way to the Supreme Court of Appeals. Accordingly, the Court finds Plaintiffs have a plain, adequate, and complete forum in which to bring these claims in State court.

While the Plaintiffs' challenge thus appears to run afoul of the Act, the jurisdictional bar here is applied cautiously.

---

**13.** Although they later modified their approach in light of Defendants' Tax Injunction Act Challenge, Plaintiffs' earlier filed motion for a preliminary injunction states "The [LVLA] was enacted for the purpose of legalizing *and taxing* the use of video poker or 'gray machines' so as to *provide revenue for the State of West Virginia.*" Mot. for Prelim.Injunc. ¶ 1 (emphasis added).

Plaintiffs are not challenging the State's *authority* to assess, levy, or collect the taxes at issue. Rather, they complain about discrete, substantive provisions of the LVLA unrelated to its taxing scheme. Nonetheless, their proposed remedy for the constitutional violations would be sweeping declaratory and injunctive relief voiding the entire LVLA, including its revenue-raising scheme. The Court is thus left with the quandary of whether to apply the Tax Injunction Act with an eye toward only the *purpose* of Plaintiffs' complaint, a declaration that some of LVLA's non-revenue-raising measures are unconstitutional, or instead with an eye toward this lawsuit's real potential, the elimination of a tax scheme the State put in place to raise substantial revenues and to address finally a charged public policy issue residing at the core of its police powers. In resolving this question, the Court is guided by the astute observations of Chief Judge Wilkinson in a related area:

> The Fund asserts that the only issue here is the Lottery's failure to act properly as a withholding agent, and that Treasury Regulations require the Lottery to honor the Fund's Form 1001 request. The Fund concludes that this action does not challenge the validity of the withholding framework, and thus is not barred by the Anti–Injunction Act.
>
> We disagree. *Regardless of how the claim is labelled, the effect of an injunction here is to interfere with the assessment or collection of a tax. The Fund is not free "to define the relief it seeks in terms permitted by the Anti–Injunction Act" while "ignor[ing] the ultimate deleterious effect such relief would have on the Government's taxing ability."*

*International Lotto Fund v. Virginia State Lottery Dept.*, 20 F.3d 589, 592 (4th Cir.1994) (emphasis added). The Court

believes the same analysis applies to prevent Plaintiffs' proposed end-run around the Tax Injunction Act.

Furthermore, as recognized in *Grace Brethren,* "Congress' intent in enacting the Tax Injunction Act was to prevent federal-court interference with the assessment and collection of state taxes[.]" *Grace Brethren,* 457 U.S. at 411, 102 S.Ct. 2498. The Act has been broadly interpreted for decades. *See Hutcherson v. Board of Supervisors,* 742 F.2d 142, 145 (4th Cir.1984) ("The Supreme Court has consistently construed § 1341 to drastically limit federal court intervention into state tax matters. We have given that statute a similar construction.") (citations omitted).

In sum, Plaintiffs' challenge is arguably more intrusive than most actions specifically challenging a state tax scheme. Rather than seeking an interpretive declaration or ruling as to one part of such a scheme, Plaintiffs seek a declaratory ruling wiping the entire LVLA, including its tax regime, from the *West Virginia Code.* The Court cannot conceive how such sweeping injunctive and declaratory relief could escape Congress' and the Supreme Court's hands-off policy counseling against intervention in state fiscal affairs by a federal chancellor.

■ As noted by Judge Michael in *Lynn v. West,* 134 F.3d 582 (4th Cir.1998), the Act applies if three prerequisites are met: "(1) the action is to 'enjoin, suspend or restrain the assessment, levy or collection' of a state tax, (2) the tax is a 'tax under State law,' and (3) the state provides a 'plain, speedy and efficient remedy' in its own courts." *Id.* at 594. All three requirements are satisfied here. Accordingly, based on the Tax Injunction Act and parallel comity considerations, the Court

lacks subject matter jurisdiction.[14] Defendants' motion to dismiss is **GRANTED.**

### B. Abstention

If the Court possessed jurisdiction it was not otherwise barred from exercising, it nevertheless would employ the doctrine of abstention and defer to the State forum in the first instance for resolution of Plaintiffs' claims under the *West Virginia Constitution.*

In *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821), a case coincidentally involving the unauthorized sale of lottery tickets, Chief Justice Marshall announced an enduring principle commanding federal courts to do the job given them by Congress and the Constitution:

> It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution.

*Id.* at 404, 5 L.Ed. 257.

Led by Justice Frankfurter, however, the Supreme Court commenced development in 1941 of a coherent framework of instances when federalism and wise judicial administration counseled restraint in exercising the power granted by Congress. *See Railroad Comm. of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (abstention via deferral to avoid deciding a federal constitutional issue pending clarification of state law by state courts); *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) (guiding abstention decisions involving the exercise of jurisdiction over declaratory judgment actions involving parallel state proceedings); *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (requiring abstention to halt interference with proceedings or orders of state administrative agencies when there are difficult questions of state law bearing on policy problems of substantial public import transcending the result in a single case and where exercise of federal review would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (abstention where there are ongoing state judicial proceedings implicating important state interests and there is an adequate opportunity to present the federal claims in the state proceeding); *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (abstention in cases of parallel litigation where exceptional circumstances exist). Despite these seemingly substantial inroads, however, abstention remains the ex-

---

**14.** Referring to the requirement under the *West Virginia Constitution* that the State own the lottery, Plaintiffs assert such ownership is inconsistent with the ability to at the same time tax the enterprise. Ownership considerations aside, however, the foregoing analysis reveals the charges imposed are nonetheless taxes. In any event, Plaintiffs seek to dovetail the two issues in an attempt to secure favorable dicta or an advisory opinion from this Court on the important state constitutional issue of whether the Limited Video Lottery is *indeed owned by the State.* The Court declines the invitation. The question is reserved in whole for the Supreme Court of Appeals.

ception and the exercise of congressionally mandated jurisdiction remains the rule. *Colorado River*, 424 U.S. at 813, 96 S.Ct. 1236.

■ As noted recently by Chief Judge Wilkinson, the overall purpose "underlying abstention is that federal courts should not exercise expansive remedial powers when to do so would damage principles of federalism and comity[.]" *Johnson v. Collins Entertainment Co.*, 204 F.3d 573, 577 (4th Cir.2000) (denying petition for rehearing en banc ).

In *Reetz v. Bozanich*, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), certain non-residents of Alaska challenged the state's restrictions on who could obtain commercial salmon fishing licenses. The non-residents claimed the law and its accompanying regulations deprived them of their rights under the Equal Protection Clause of the Fourteenth Amendment and their rights under the Alaska Constitution dealing specifically with fishing rights. The defendants moved to dismiss or stay the case before a three-judge district court panel pending the determination of the Alaska constitutional question by an Alaskan state court. Justice Douglas' analysis is worth quoting at length:

> This case is virtually on all fours with *City of Meridian v. Southern Bell Tel. & Tel. Co.*, where a single district judge in construing a Mississippi statute held that it violated both the Federal and the State Constitutions. The Court of Appeals affirmed and we vacated its judgment and remanded to the District Court with directions to hold the case while the parties repaired to a state tribunal 'for an authoritative declaration of applicable state law.'
>
> We said:
>
> 'Proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying federal constitutional questions. *** That is especially desirable where the questions of state law are enmeshed with federal questions. *** Here, the state law problems are delicate ones, the resolution of which is not without substantial difficulty—certainly for a federal court. *** *In such a case, when the state court's interpretation of the statute or evaluation of its validity under the state constitution may obviate any need to* consider its validity under the Federal Constitution, the federal court should hold its hand, lest it render a constitutional decision unnecessarily.'
>
> We are advised that the provisions of the Alaska Constitution at issue have never been interpreted by an Alaska court. The District Court, feeling sure of its grounds on the merits, held, however, that this was not a proper case for abstention, saying that 'if the question had been presented to an Alaska court, it would have shared our conviction that the challenged gear licensing scheme is not supportable.' The three-judge panel was a distinguished one, two being former Alaska lawyers. And they felt that prompt decision was necessary to avoid the 'grave and irreparable' injury to the 'economic livelihood' of the appellees which would result, if they could not engage in their occupation 'during this year's forthcoming fishing season.'
>
> . . . .
>
> *A state court decision here, however, could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship.*
>
> The *Pullman* doctrine was based on 'the avoidance of needless friction' be-

tween federal pronouncements and state policies. The instant case is the classic case in that tradition, *for here the nub of the whole controversy may be the state constitution. The constitutional provisions relate to fish resources, an asset unique in its abundance in Alaska. The statute and regulations relate to that same unique resource, the management of which is a matter of great state concern.* We appreciate why the District Court felt concern over the effect of further delay on these plaintiffs, the appellees here; but we have concluded that the first judicial application of these constitutional provisions should properly be by an Alaska court.

We think the federal court should have stayed its hand while the parties repaired to the state courts for a resolution of their state constitutional questions.

*Id.* at 85–87, 90 S.Ct. 788 (emphasis added). In addition to *Reetz* and *City of Meridian,* a variety of Supreme Court decisions support abstention in similar situations. *See, e.g., Askew v. Hargrave,* 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).[15]

■ Our Court of Appeals has noted generally "*Pullman* abstention ... is appropriate where there are unsettled questions of state law that may dispose of the case and avoid the need for deciding the constitutional question." *Meredith v. Talbot County,* 828 F.2d 228, 231 (4th Cir.

1987). Later reducing the inquiry to a two-part test, the Court of Appeals observed abstention is appropriate only where "there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is 'potentially dispositive'." *Educational Servs., Inc. v. Maryland State Bd. for Higher Educ.,* 710 F.2d 170, 174 (4th Cir. 1983) (quoted authority omitted); *see also Donohoe Constr. Co., Inc. v. Montgomery County Council,* 567 F.2d 603, 607 (4th Cir.1977).

■ In this litigation, the first prong of the two-part test is satisfied. The Complaint asks the Court to pass on such questions as (1) whether the State actually owns the limited video lottery as required by the *West Virginia Constitution;* and (2) whether the LVLA violates the one-object rule under the *West Virginia Constitution.* More importantly, however, the Complaint seeks a declaration that the limited video lottery is not a constitutionally authorized lottery, but rather simple gambling prohibited by the *West Virginia Constitution.* This claim appears based in whole on the Supreme Court of Appeals' dicta in *Polan:*

> While we recognize that the voters, upon ratifying the amendment to article VI, section 36 of the *West Virginia Constitution,* authorized the legislature to pass

**15.** Our Court of Appeals has taken a similar approach. *National Capital Naturists, Inc. v. Board of Supervisors,* 878 F.2d 128, 133 (1989) ("The interest of any litigant in having a federal court adjudicate its federal claims is not to be lightly disregarded. Historically, however, that interest has had to be accommodated to the interest of states in interpreting their own laws and to the interest of federal courts in not reaching significant constitutional questions prematurely."); *Ratcliff v. Buncombe County,* 759 F.2d 1183, 1187

(4th Cir.1985) ("It is a matter for the state courts to determine whether Chapter 129 is in conflict with the State Constitution or whether it is otherwise invalid. Should the state courts determine that Chapter 129's local prohibition on dual·office holding is invalid, it would be unnecessary for a federal court to determine whether the dual office holding provision of Chapter 129 violates the equal protection clause of the fourteenth amendment.").

laws establishing a state-run lottery, *we question whether the voters were approving video lottery operations. There is nothing in the record before us which indicates that electronic video lottery was contemplated or even existed at the time voters approved the lottery amendment in 1984.*

*Polan,* 190 W.Va. at 286, n. 22, 438 S.E.2d at 318 n. 22 (emphasis added); *see also United States v. Dobkin,* 188 W.Va. at 212, 423 S.E.2d at 615 (stating "the use of video poker machines . . . [has] no relation whatsoever to a lottery or raffle."). The first two questions are potentially quite complex, and, given the LVLA is but a few months old, their resolution under West Virginia law is not predictable with any certainty.

The issue may result in a potentially divisive conflict among the three branches of State government, placing the state judicial branch in the unenviable position of having to pass on the constitutionality of legislation aggressively advocated by the Governor, the outcome of which will have a profound impact on the State fisc. This is ground upon which a federal chancellor should tread lightly, if at all. Resolution of the interlocking constitutional, statutory, and perhaps even regulatory, issues raised by Plaintiffs' claims is best reserved for the state tribunals. Furthermore, resolution of any of the State constitutional claims in Plaintiffs' favor would negate consideration of the federal claims. The entire LVLA could cease to apply.

This case is plainly one for which the doctrine of abstention generally was crafted to cover. At bottom, abstention requires federal courts to respond with caution when far-reaching equitable relief is sought to upset regulation in areas traditionally committed to state control, especially when the state sovereign itself has struggled with drawing the right balance.

Both concerns are present here. First, this case bears an eerie resemblance to one decided just two years ago by our Court of Appeals. In that case, Chief Judge Wilkinson observed regulation of gambling resides at the core of state police power:

[T]he resolution of the volatile questions surrounding video poker must be committed above all to the legislative, judicial, and regulatory processes of South Carolina.

. . . .

It is important to note at the outset that the district court ventured into an area where state authority has long been preeminent. The regulation of gambling enterprises lies at the heart of the state's police power. Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens. The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens. The question of how best to regulate gambling activity is also one to which different states can arrive at different answers based on their different experiences.

State gaming policies reflect a delicate trade-off between the economic boon of increased tax revenue and enhanced employment on the one hand and the risk of moral rot, human exploitation, and political corruption on the other. Put another way, the question is whether the maximization of individual freedom and choice works a wholesale diminution in general social well-being. Each side of this scale embodies the classic subject matter of state prerogative.

*Johnson v. Collins Entertainment Co., Inc.,* 199 F.3d 710, 715, 720 (4th Cir.1999).

Further, as discussed *supra* in Section IA–D, West Virginia has, since its very

creation, struggled with the regulation of gambling machines and related devices. The proposed global resolution is the LVLA, a product of years of public policy research and debate, a debate that yet continues following its passage. Plaintiffs' proposed remedy is for the undersigned, sitting as a court of equity, to void the entire statutory scheme and throw the State back to the gray machine twilight zone. Chief Judge Wilkinson's observations, albeit under a different abstention doctrine, again provide significant guidance:

> Whether even to permit video poker in the first place is a quintessential state decision. And it is certainly for the state regulatory system—and ultimately for the people of South Carolina—to decide how best to implement their state gaming policy and to remedy any violations. Federal equitable forays into such state enforcement schemes risk the creation of confusing, duplicative directions that cause friction and impermissibly transfer power from democratically accountable state officials to life-tenured federal judges. Federalism does not countenance one cook too many stirring the state brew.

*Id.* at 725.

Accordingly, even if the Court had concluded pages back it possessed jurisdiction, it would abstain from its exercise. The resolution of the federal constitutional claims would be stayed, pending an authoritative decision from the Supreme Court of Appeals of West Virginia whether the LVLA runs afoul of, or passes muster under, the *West Virginia Constitution.*

### III. CONCLUSION

The motion to dismiss is **GRANTED.** The action is **DISMISSED,** without prejudice and removed from the docket.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post a copy on the Court's website at http://www.wvsd.uscourts.gov.